EXHIBIT "A"

Shauna R. Miller, Bar No. 015197
Senior Bar Counsel
State Bar of Arizona
4201 N. 24th Street, Suite 100
Phoenix, Arizona 85016-6266
Telephone (602)340-7386
Email: LRO@staff.azbar.org

OFFICE OF THE
PRESIDING DISCIPLINARY JUDGE
SUPREME COURT OF ARIZONA

MAR   6 2018

FILED

BY _____

## BEFORE THE PRESIDING DISCIPLINARY JUDGE

IN THE MATTER OF A MEMBER OF
THE STATE BAR OF ARIZONA,

**PETER STROJNIK**
**Bar No. 006464**

Respondent.

**PDJ-**2018-9018
[State Bar File No. 18-0615]

**THE STATE BAR'S MOTION
FOR INTERIM SUSPENSION**

The State Bar of Arizona, through undersigned bar counsel, moves the Presiding Disciplinary Judge, pursuant to Rule 61, Ariz. R. Sup. Ct., to order the interim suspension of Respondent, Peter Strojnik. Respondent has engaged in conduct the continuation of which will result in substantial harm, loss or damage to the public, the legal profession or the administration of justice.

This motion is supported by the attached Affidavits, Exhibits 1 through 14, and the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

The State Bar of Arizona moves for the interim suspension of Respondent as the State Bar has received compelling evidence that Respondent has engaged in serious misconduct including, but not limited to making misrepresentations to a court and by filing harassing and vexatious pleadings with the court. *See* Rule 61(a), Ariz. R. Sup. Ct.

### STATE COURT CASES

1.     On February 6, 2016, the State Bar received the first of fifteen complaints from small business owners, stating that each had received lawsuits[1] filed by Respondent in the Superior Court of Maricopa County for alleged minor violations of the American's with Disabilities Act (ADA) and the Arizonan's with Disabilities Act (AzDA). (**Exhibit 1** at ¶4, bar counsel Shauna Miller's affidavit).

2.     The lawsuits were virtually all the same; they were filed against small business owners (hereinafter Defendant's). The lawsuits contained vague, non-specific allegations of ADA or AzDA parking sign violations. All of the lawsuits contained demands for attorney's fees in an amount of no less than $5,000, regardless if the business had remedied the violation. At least one of the

---

[1] Not all of the lawsuits were properly served.

Defendant's settled with Respondent for $4,750. All lawsuits requested the closure of the Defendant's business until the Defendant fully complied with the ADA and/or the AzDA. (**Exhibit 1** at ¶¶5 and 6).

3.       Many of the Defendants indicated that it appeared someone would go through the parking lot where a number of businesses were located, and shortly thereafter multiple business that shared the same parking lot would receive Respondent's lawsuits.[2] (**Exhibit 1** at ¶7)

4.       Soon after the complaints came in, the Arizona Attorney's General Office (The AG or the AG's office) filed a Motion to Consolidate Cases for Limited Purposes[3] and a Motion Intervene as a Limited Purpose Defendant[4] in CV-2016-090506. (Affidavit 1, at ¶8; Affidavit 2, Assistant Attorney General Brunn (Beau) W. Roysden, III, at ¶¶5 and 6; **Exhibits 1 and 2**).

---

[2] Generally Advocates of Individuals with Disabilities, LLC, (AID) and David Ritzenthaler, although there were several variations of AID as an entity.    In addition, David Ritzenthaler was not always the individual Plaintiff.

[3] The entire title of the motion is "State of Arizona's Motion to Consolidate Cases for Limited Purposes, Set a Scheduling Conference, Allow Leave to Serve by Other Means and Request for Expedited Consideration."

[4] The entire title of the motion is "State of Arizona's Motion to Intervene as a Limited Purpose Defendant and Request for Expedited Consideration."

5.      The AG's office identified approximately 1,700 copy-and-paste complaints Respondent filed in Maricopa County Superior Court alleging violations of the ADA and the AzDA. On September 9, 2016, the Court granted the State's motion to intervene. (**Exhibit 3**).

6.      On December 8, 2016, the AG's Office filed a Motion to Dismiss and Motion for Judgment on the Pleadings. (Affidavit 2, ¶7; **Exhibit 4**) On March 27, 2017, the AG's Office filed a Motion for Rule 11 Sanctions, Motion for Non-Rule 11 Sanctions, Motion in Limine and Motion for Evidentiary Hearing. (Affidavit 2, ¶8).

7.      On April 17, 2017, attorney Thomas Horne entered his appearance on behalf of the Plaintiffs and Respondent.

8.      On April 27, 2017, the Court dismissed all of the consolidated cases for lack of standing. (**Exhibit 5**) On May 25, 2017, Respondent appealed the dismissal to the Court of Appeals. (**Exhibit 6**).

9.      On August 8, 2017, the Court granted the AG's request for an evidentiary hearing on Rule 11 and non-Rule 11 sanctions and set the hearing for November 20 and 21, 2017. (**Exhibit 7**).

10.    The AG's Office engaged in settlement discussions with Respondent and Plaintiffs, through their attorney Mr. Horne[5]. On November 2, 2017, Mr. Horne sent an email to the Assistant Attorney General Brunn (Beau) W. Roysden III and attached a Ninth Circuit case; *Civil Rights Education and Enforcement Center v. Hospitality Properties Trust* ("*CREEC*") No. 16-16269, 867 F.3d 1093 (9th Cir. Aug. 9, 2017), indicating that the case was important and the parties needed to discuss it. (Affidavit 2, at ¶9) On November 3-6, 2017, Respondent, other involved parties, and the AG's office signed and filed a Proposed Order Approving Stipulation between Plaintiffs and Defendant-Intervenor, Awarding Sanctions against Certain Plaintiffs, and Returning Cases to Originating Divisions. (Affidavit 2, at ¶10).

11.    The Court approved the parties' agreement and entered its Order on

---

[5] Respondent was representing Advocates for Individual's with Disabilities Foundation Inc., among other Plaintiffs, and Plaintiffs and Respondent were represented in the settlement discussion and the sanction motion by attorney Tom Horne. In some places, the State Bar will refer only to Respondent, as it is his misconduct that the State Bar is investigating.

November 13, 2017[6]. (Affidavit 2, at ¶11; **Exhibit 8**). Under the agreement, Respondent and his clients avoided the evidentiary hearing on sanctions. Respondent agreed to withdraw the appeal of the Rule 54 dismissal. The Plaintiffs obtained a "consent to the entry of judgment – as a sanction pursuant to Rule 11, A.R.S. §12-349, and the inherent power of the Court – against [Plaintiffs] in favor of the Consolidated Defendants in each of the consolidated cases for the defendant's reasonable attorneys' fees and costs (if any) in defending the case." (**Exhibit 8** at ¶¶ 5, 6, and 9).

12.   As part of the agreement, Plaintiffs were ordered to pay the AG's Office $25,000 for an ADA and AzDa education and compliance fund. Further, "Plaintiffs and all of their affiliates and successors that have actual notice of this order are permanently enjoined from filing as plaintiff any actions in the Superior Court of the State of Arizona that allege violations of the [AzAD], [ADA] or any regulations issued thereunder." The State was to be dismissed as a defendant after payment of the $25,000, "other than [from case] CV 2016-090506 for purposes of enforcing this order (if necessary)." (**Exhibit 8** at ¶¶4, 7, and 8).

---

[6] The Order was signed on November 13, 2017 by Judge Talamante, but was filed on November 14, 2017 by the Clerk of the Court.

13.     On February 2, 2018, the AG's Office filed an Application for Order to Show Cause in CV 2016-090506 ("Application OSC") (Affidavit 2 at ¶12; **Exhibit 9**), alleging that Respondent violated the Court's November 13, 2017, Order by:

- Filing improper Rule 60 motions in some of the dismissed cases on the purported grounds of a new case, *CREEC*, even though Respondent knew about the case and provided it to the AG's office before signing the stipulated agreement, and

- Lying to the Superior Court and Defendants in the Rule 60 motions when Respondent stated that previously he "was not in a position to brief *CREEC* or inform the court of its holding" and "this case was not in a procedural posture to permit Plaintiff to bring the recent decision before the Court" in the consolidated cases. (**Exhibit 9** at 2:4 – 12).

14.     In support of its Application OSC, the AG filed the declaration of Assistant Attorney General Brunn (Beau) W. Roysden III (**Exhibit 9**, Roysden affidavit). Attached to the declaration are three Rule 60 Motions for Relief from Judgment filed by Respondent. On January 19, 2018, Respondent filed Plaintiff's Motion for Relief from Judgment in *Advocates for Individuals with Disabilities*

*Foundation, Inc. v. KGN, LLC, (KGN)*, CV2016-011249; on January 23, 2018, Respondent filed Plaintiff's Motion for Relief from Judgment in *Advocates for Individuals with Disabilities Foundation, Inc. v. Bryan Investment Group, LLC, (Bryan)* CV2016-006874; on January 31, 2018, Respondent filed Plaintiff's Motion for Relief from Judgment in *Advocates for Individuals with Disabilities Foundation, Inc. v. HD Development of Maryland, Inc., (HD Development)* CV2016-006589.[7]  (**Exhibit 9**, Attachments C, D, and E).  The relief sought in all three motions is to vacate Judge Talamante's dismissal of the consolidated ADA/AzDA cases.  In other words, Respondent is attempting to have, at the very least, these three cases reinstated so he can continue with the litigation.

15.     The Order to Show Cause hearing requested by the State has been set for April 13, 2018 (**Exhibit 10**).

16.     The State Bar believes that Respondent, if not stopped by this court, will continue to file Rule 60 Motions for Relief from Judgment in all of the dismissed consolidated cases, causing substantial harm, loss or damage to the public, the legal profession or the administration of justice.

---

[7] These motions are attached to Mr. Roysden's declaration as Exhibits C, D, and E.

Page 8 of 15

## ARIZONA DISTRICT COURT CASES

17.    Respondent has also been filing ADA and AzDA complaints in the United State District Court of Arizona, District of Arizona (District Court).   On September 5, 2017, US District Court Judge Neil V. Wake issued an Order in *Advocates for Individuals With Disabilities LLC, and David Ritzenthaler, vs. MidFirst Bank, (MidFirst Bank)* 2:16-cv-01969-PHX-NVW, dismissing Respondent's complaint against *MidFirst Bank* ("Dismissal Order") (**Exhibit 11**).

18.    The Court noted in its Dismissal Order that Respondent and Plaintiffs had "pursued upwards of 160 cookie-cutter lawsuits in federal court ...." The Court also strongly suggested that sanctions were appropriate, concluding that Respondent's "extortionate practice ha[d] become pervasive," (**Exhibit 11** at 3:4-6) and that he had engaged in "ethically suspect tactics" (**Exhibit 11** at 9:18-20).   The Court also denied Respondent's request to remand the case to the state court, stating that "it is certain that Arizona courts would not waive the standing requirement and empower [Respondent's] unethical extortion of unreasonable attorney's fees from defendants." (**Exhibit 11** at 10:20-22)

19.     On December 5, 2017, the AG's Office filed a Motion to Intervene in

*MidFirst Bank* case.   (Affidavit 2 at ¶13; **Exhibit 12**)   In its motion, the AG

explained the basis for its request to intervene.

> [T]he State believes that a vexatious litigant determination against
> [Respondent] is appropriate under several possible bases. By way of
> preview, the grounds for vexations litigant determinations include that
> [Respondent]:
>   1.  Misrepresented (and drastically exaggerated) his actual and/or
>       reasonable fees in determining a minimum of $5,000 in each one of
>       his cookie-cutter complaints.
>   2.  Misrepresented Plaintiffs' actual damages in several suits, seeking
>       $5,000 or more without any good-faith basis for doing so.
>   3.  Entered into an agreement with Plaintiffs where he would charge (but
>       never collect) an illusory $5,000 fee in order to extract more money
>       from defendants, and then donate to Plaintiffs any settlement money
>       paying the supposed fee.
>   4.  Misrepresented Plaintiffs' intent to litigate their federal ADA claims,
>       forcing defendants to incur needless and avoidable costs of removal.
>   5.  Filed numerous suits to extort settlements from defendants,
>       improperly relying on the cost of litigation to coerce settlements.
>   6.  Electronically affixed Plaintiff Ritzenthaler's signature to
>       hundreds of verified complaints he appears not to have ever
>       read.

(**Exhibit 12** at 11:25 – 12:15).

20.     The AG indicates in its Motion to Intervene that Respondent "has

resumed filing new suits in this Court with a new plaintiff, Fernando Gastelum.

To date [Respondent] has filed over 55 cases in this court with Gastelum as

plaintiff, and over 25 since this Court's Dismissal Order." (**Exhibit 12** at 3:22-25). One such lawsuit is *Ferando Gastelum vs. Vendata Resources (Vendata)* LLC, 2:17-cv-02623-DJH.

21.    On January 23, 2018, the AG's Office filed a Notice of Supplemental Evidence in Support of its Motion to Intervene ("Notice of Supplemental Evidence") (Affidavit 2 at ¶14; **Exhibit 13**). It was necessary to file the Notice of Supplemental Evidence because at the time the AG filed the Motion to Intervene, it did not have a copy of the Settlement Agreement and Release or excerpts from Gastelum's deposition, which was taken on November 17, 2017 in the *Vendata* case. (Affidavit 2 at ¶14).

22.    The additional evidence is relevant to the AG's Motion to Intervene in *MidFirst Bank*, as it supports the AG's request that the Court determine that Respondent is a vexatious litigant. Attachment A to the Motion for Supplemental Evidence is a Settlement Agreement and Release in *Vendata*. The amount that *Vendata* paid to dispose of the case was $18,750 in "costs, expenses, compensatory damages, punitive damages, attorney's fees and equitable damages." (**Exhibit 13**, Attachment A, Settlement Agreement and Release, at ¶2).

23.     In his deposition, Gastelum testified that he receives a flat $350 for each settlement and had (as of November 17, 2017) received approximately $1,500. He also testified that he thinks his son might receive a flat $150 for each settlement (**Exhibit 13**, Attachment B, at 173:24 – 175:3). Gastelum also testified that he did not "know what the settlement amount of each case is that [was] settled." (*Id* at 174:11 – 13).

24.     When the AG filed the Notice of Supplemental Evidence, it also did not have a copy of the fee agreement between Respondent and Gastelum. The AG's Office provided the State Bar with the Plaintiff's Application for Fee, Costs and Expenses ("Fee Application") in *Gastelum v. Pride Hospitality, Inc.*, 2:17-cv-03607-GMS. (**Exhibit 14**). Respondent asked the court to award $18,330 in attorney's fees, $1,598.60 in costs, and $1,362.40 "[c]ommon pre-filing due diligence investigations allocated to this case..." (**Exhibit 14**; Fee Application at 5:3 – 13).

25.     The fee agreement provides Respondent with "unfettered discretion in all settlement matters provided, however, that Client's consent shall be required when the settlement is less than $350.00 payable to Client." (**Exhibit 14**,

Declaration of Peter Strojnik Under the Penalty FPerjury (sic) at 6, Addendum A "Settlement or Award").

26.     Respondent is continuing to file lawsuits in the District Court, and he is demanding more money than ethically allowed. As recently as February 22, 2018, Respondent's conduct has been the subject of news articles. Respondent's on going conduct is causing loss to the public and damage to the legal profession. (Affidavit 1 at ¶9).

## CONCLUSION

Respondent should not be allowed to continue filing ADA complaints, in either the state or federal courts, which appear to be nothing more than vehicles for Respondent to extort unreasonable attorney's fees from defendants. Respondent is engaging in conduct the continuation of which will result in substantial harm, loss or damage to the public, the legal profession or the administration of justice and it is with this harm in mind that the State Bar moves for the immediate interim suspension of Respondent. The State Bar requests that, pursuant to Rule 61(c)(2)(A), Ariz. R. Sup. Ct. that the Court immediately issue an order requiring the State Bar to serve this motion on Respondent, and to set a hearing as soon as allowable under the rules.

**DATED** this _6th_ day of March, 2018

Shauna R. Miller
Senior Bar Counsel

Original filed with the Disciplinary Clerk of
the Office of the Presiding Disciplinary Judge
of the Supreme Court of Arizona
this 6th day of March, 2018.

Copy of the foregoing emailed
this 6th day of March, 2018, to:

The Honorable William J. O'Neil
Presiding Disciplinary Judge
Supreme Court of Arizona
1501 West Washington Street, Suite 102
Phoenix, Arizona 85007
E-mail: officepdj@courts.az.gov

Copy of the foregoing mailed/emailed
this 6th day of March, 2018, to:

Peter Strojnik
2375 E Camelback Rd., Ste. 600
Phoenix, AZ 85016-3493
E-mail: ps@strojnik.com
Respondent

Page 14 of 15

Copy of the foregoing hand-delivered
this 10th day of March, 2018, to:

Lawyer Regulation Records Manager
State Bar of Arizona
4201 N. 24th St., Suite 100
Phoenix, Arizona 85016-6266

by: _Karen E. Calcapo_
     SRM/kec

# EXHIBIT "B"

1   **WO**

2

3

4

5

6                        IN THE UNITED STATES DISTRICT COURT

7                           FOR THE DISTRICT OF ARIZONA

8

9   Advocates for Individuals With Disabilities          No. CV-16-01969-PHX-NVW
    LLC, and David Ritzenthaler,
10                                                        **ORDER**
                        Plaintiffs,
11
    v.
12
    MidFirst Bank,
13
                        Defendant.
14

15

16          Can a Tibetan Sherpa who has never set foot in Arizona sue an Arizona business

17   for disability discrimination?    The question bears on whether plaintiffs David

18   Ritzenthaler and Advocates for Individuals with Disabilities LLC (collectively "AID"),

19   both Arizona residents, can sue defendant MidFirst Bank ("MidFirst"), an Arizona

20   business, for noncompliance with state and federal disability laws.   AID insists they can

21   despite never having visited MidFirst's business location and alleging no injury beyond

22   Ritzenthaler's awareness that MidFirst may have failed to conform its parking lot to the

23   precise requirements of both the Americans with Disabilities Act ("ADA"), 42 U.S.C.

24   §§ 12181 through 12189, and the Arizonans with Disabilities Act ("AZDA"), A.R.S.

25   §§ 41-1492 through 41-1492.012.   The federal claims are being dismissed for lack of

26   standing, but AID asks this Court to remand its state claims to Arizona state court, where

27   they believe even a Tibetan Sherpa would have standing to bring them.   Before the Court

28   is their Motion to Remand the state law claims. (Doc. 24.)   For the reasons that follow,

the Motion to Remand the state law claims will be denied, and this case will be dismissed in its entirety.

## I.   BACKGROUND

On May 17, 2016, AID filed a civil complaint in Maricopa County Superior Court alleging that MidFirst, located in Gilbert, Arizona, violated both the ADA and the AZDA. (Doc. 1-1 at 7.) MidFirst removed the case to federal court. (Doc. 1.) The allegations state no unique facts about MidFirst or its facilities but simply recite generalized allegations that MidFirst failed to maintain various parking lot specifications (adequate spaces and proper signage) required by state and federal disability laws. What's more, rather than alleging particular harm to Ritzenthaler (or anyone else), the complaint only states, "On or about Tuesday, March 15 2016 [sic], Plaintiff became aware" of various purported insufficiencies involving parking spot size and signage. (Doc. 1-1 at 7.) It is never asserted that Ritzenthaler, who the complaint characterizes as legally disabled, personally visited MidFirst's business. (The complaint never specifies what Ritzenthaler's disability is or how the MidFirst parking lot's purported deficiencies denied him access to any facilities. The Court assumes for the purpose of this order that Ritzenthaler does in fact have a disability recognized under both the ADA and the AZDA.) The complaint merely says he will avoid visiting MidFirst in the future unless it comes into compliance with the law. (Doc. 1-1 at 8.)

Template complaints filled with non-specific allegations have become the stock-in-trade of attorneys Peter Strojnik and Fabian Zazueta. As in many of their cases, the discrepancies in parking signage and striping here were minor, even trivial. MidFirst immediately corrected them, as it would have if Strojnik and Zazueta had written a demand letter or just made a phone call. Though the minor discrepancies are often corrected immediately, Strojnik and Zazueta generally refuse to dismiss the cases they bring unless the defendants pay them attorney's fees, in this case "no less than $5,000." (Doc. 1-1 at 11.) They worry that just fixing the minor discrepancies will jeopardize their fee claim, as their template complaint seeks award of fees "[i]rrespective of Defendants'

1   'voluntary cessation' of the AzDA [sic] and ADA violation."  (*Id.*)  That then forces the

2   defendants to retain counsel to resist the fee claim—or to pay Strojnik and Zazueta their

3   fee demands to avoid retaining and paying their own attorneys.

4          This extortionate practice has become pervasive.  With Ritzenthaler listed as the

5   aggrieved co-plaintiff, AID has pursued upwards of 160 cookie-cutter lawsuits in federal

6   court and, from early to later 2016, more than 1,700 such suits in Arizona state court.

7   They come under the heading of different organizations with closely related names:

8   "Advocates for Individuals with Disabilities Foundation," "Advocates for Individuals

9   with Disabilities LLC," and "American Advocates for Disabled Individuals."  (Doc. 42-1

10  at 4.)  (Some have also been filed under the name "Advocates for American Disabled

11  Individuals LLC."  *See, e.g.*, *Advocates for American Disabled Individuals LLC v. Price

12  Company*, No. CV-16-02141-PHX-GMS, 2016 WL 5939467, at *1 (D. Ariz. Oct. 13,

13  2016).)  The pleadings here follow the same script recited in other complaints right down

14  to the same typographical errors.  *See, e.g.*, Doc. 42-2 at 4 (complaint in separate case

15  alleging, among other things, that "Plaintiff suffers from disability [sic]" and that

16  MidFirst's parking lot suffers from "inadequacy of handicapped parking spaces,

17  insufficient designation or signage and or [sic] insufficient disbursement of such parking

18  spaces").

19          On September 8, 2016, the Court ordered AID to show cause why this case should

20  not be dismissed for lack of standing.  (Doc. 20.)  The Court also permitted AID to file an

21  amended complaint if that would cure any standing defects.  (Doc. 23.)  AID did not file

22  an amended complaint but instead asked that the case be remanded to state court.  (Doc.

23  24.)  Having previously found that AID failed to establish standing requisite for federal

24  jurisdiction (Doc. 26), this Court determined MidFirst was entitled to have a federal court

25  adjudicate that AID lacks standing to bring the federal claims.  The Court ruled at a

26  hearing on the Order to Show Cause that the ADA claims should be dismissed outright

27  rather than remanded.  (Doc. 45 at 81.)  However, AID demanded that the state law claim

28  be remanded for further consideration in the state court, not dismissed by this Court.  The

1  sole state law question is whether AID's lack of standing requires dismissal of the

2  identical Arizona statutory claims, too.  If not, then AID intends to litigate its state law

3  claims in state court for which it has no standing and no injury.  The state law issue of

4  standing is nearly the same question this Court has already decided in dismissing the

5  federal claims for lack of standing.

6      Shortly before the Show Cause Hearing, on request of the Arizona Attorney

7  General, more than 1,000 identical cases filed by Strojnik and Zazueta were consolidated

8  in Arizona superior court.  By written order of March 2, 2017, the superior court

9  dismissed all the consolidated cases with prejudice for lack of standing, except one.

10  (Doc. 48-1 at 5-6.)  The judge's ruling contained the following findings:

12      THE COURT FINDS that there are no allegations in the
        [consolidated] Complaint that would support the tester argument raised by
13      Plaintiffs in their memorandum.  Plaintiff has failed to show a distinct and
        palpable injury in these cases. The Court previously found that the
14      Complaints are substantially similar for purposes of the standing issue.

16  (Doc. 48-1 at 6.)  That court exempted only one case from its blanket dismissal order.

17  (*Id.*)  In that one case, *Advocates for American Disabled Individuals, LLC, et al. v. Tartan*

18  *Properties*, a different judge had previously ruled the complaint was "sufficient to

19  withstand a Motion to Dismiss based on lack of standing."  (Doc. 47-1 at 2.)  The court

20  declined to overturn that aberrant ruling, probably under the Arizona courts' strong

21  admonition against "horizontal appeals," a rare and disfavored practice in which a

22  superior court judge revisits rulings previously made in the same case by a prior judge.

23  *See Powell-Cerkoney v. TCR-Montana Ranch Joint Venture, II*, 176 Ariz. 275, 278-79,

24  860 P.2d 1328, 1331-32 (Ct. App. 1993) ("We criticize horizontal appeals because they

25  waste judicial resources by asking two judges to consider identical motions and because

26  they encourage 'judge shopping.'").  (Unlike federal court where cases remain assigned

27  to the same judge, in superior court cases are routinely reassigned to different judges,

28  who rotate departments every few years.)

## II.   LEGAL STANDARDS

Federal statute requires that, where a case has been removed to federal court, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."  28 U.S.C. § 1447(c).  The Ninth Circuit has recognized an exception to this requirement where there is "absolute certainty that remand would prove futile."  *Bell v. City of Kellogg*, 922 F.2d 1418, 1425 (9th Cir. 1991) (internal quotation marks omitted).  The *Bell* court premised this "futility doctrine" on the assumption that Congress did not "intend[] to ignore the interest of efficient use of judicial resources."  *Id.* at 1424-25.  Some courts have questioned the legitimacy of *Bell*, noting the statutory language that "the case shall be remanded."  *See, e.g., Polo v. Innoventions Int'l, LLC*, 833 F.3d 1193, 1197-98 (9th Cir. 2016) (questioning *Bell* but declining to overrule it despite circuit split on the futility doctrine).

## III.   ANALYSIS

The *Bell* standard for dismissing rather than remanding the state law claim is whether there is "absolute certainty that remand would prove futile."  *Bell*, 922 F.2d at 1425.  In *Bell* the Ninth Circuit affirmed the trial court's decision to dismiss rather than remand a remaining state law claim because a state law requirement of posting a bond was defaulted.  As the court explained:

> The state election statute provided the only state cause of action for the plaintiffs.  The state court would have simply dismissed the action on remand due to the fatal failure to comply with the bond posting requirement.  Because we are certain that a remand to state court would be futile, no comity concerns are involved.

*Id.*  The federal court's decision to dismiss the case rather than remand it for the inevitable dismissal in state court "prevent[ed] any further waste of valuable judicial time and resources," not to mention waste of the parties' legal fees.  *Id.*  This is even a better case for the futility doctrine than *Bell*.  The standing question to be decided under state

1   law here is the same question this Court has already decided under federal law.[1]

2   Despite having effectively conceded that Ritzenthaler suffered no particularized

3   injury, AID argues that this Court cannot say with absolute certainty this case would be

4   dismissed in Arizona state court. The basis for its argument is twofold. First, Arizona

5   has no "case or controversy" requirement like the one found in the U.S. Constitution

6   binding the federal courts. (Doc. 24 at 4.) Even if Ritzenthaler did not suffer an injury

7   cognizable under federal standing requirements, AID contends he could still have

8   litigated in Arizona state court despite lack of standing. Second, and related, AID

9   contends he has standing under the AZDA's enforcement provision, which at the time

10   this action was filed permitted "[a]ny person who believes" an entity has violated or will

11   imminently violate the AZDA to "institute a civil action for preventive or mandatory

12   relief." A.R.S. § 41-1492.08(A) (2011). "Any person," says AID, is so broad a standard

13   that essentially anyone on the planet, including—in Strojnik's words—"the Sherpa [in]

14   Tibet, would have standing if he had knowledge of a violation." (Doc. 45 at 34.)

15   The superior court has now decided that in more than 1,000 "substantively

16   similar" cases AID and Ritzenthaler do not have standing because they "failed to show a

17   distinct and palpable injury." (Doc. 48-1 at 6.) The Court has not examined every such

18   case, but in one, *Advocates for American Disabled Individuals, LLC v. 1639 40th Street*

19   *LLC*, the complaint is virtually identical to the complaint in this case save for the dates,

20   the name of the defendant, and the particular parking lot insufficiencies alleged. *See*

21   —————————

22   [1] The doubts AID raises about *Bell* are overstated. They are grounded in the
23   circumstance that the direction to remand is unqualified. But statutory construction often
     finds narrow exceptions in circumstances where the main purpose is ill served or
24   unfairness could arise from too literal a reading (e.g., implied equitable tolling doctrines).
     Section 1447(c) is set in a matrix of jurisdictional statutes:

25   But these statutes were themselves passed against the backdrop of a large
26   body of standing law on matters of substance, remedy, and jurisdiction. As
     is true of all legislation, it is a major problem of *interpretation* how to fit
27   the new enactment into this preexisting texture. No statute recreates the
     entire legal universe.

28   Paul M. Bator, *The State Courts and Federal Constitutional Litigation*, 22 Wm. & Mary
     L. Rev. 605, 622 n. 49 (1981) (emphasis in original).

Doc. 42-2 at 3-10.  Every allegation pertinent to standing is word-for-word the same.  That case "failed to show a distinct and palpable injury."  (Doc. 48-1 at 6.)  It has been adjudicated that under state law in those thousand-plus cases, AID and Ritzenthaler do not have standing.

### A.    The AZDA Does Not Give Standing to the Whole World

AID nonetheless points to *Tarian Properties*, the single case among those consolidated that was not dismissed, and insists that in light of its resilience, one cannot be "absolutely certain" that this action against MidFirst would be dismissed if remanded.  (Doc. 47 at 2.)  AID in essence asks the Court to find uncertainty in the fact that out of more than 1,000 cases it has filed in state court, a single one was not dismissed.  But the obvious reason that *Tarian Properties* was excluded from the otherwise blanket dismissal was that an earlier judge in the same case had already and erroneously denied dismissal.  Though an erroneous interlocutory ruling is not final under Arizona procedure, any more than it is under federal procedure, the Arizona courts strongly counsel newly assigned superior court judges not to revisit prior rulings by different judges, lest the courts be swamped with such judge-shopping motions. *See Powell-Cerkoney*, 176 Ariz. at 278-79, 860 P.2d at 1331-32.  That earlier aberrant ruling does not detract from the certainty of Arizona law now.

As noted, Strojnik originally argued that AID, and anyone else in the world, would have standing under the AZDA because the statute read:

> *Any person who believes* that any covered person or entity has engaged in, or that there are reasonable grounds to believe that any covered person or entity is about to engage in, any act or practice prohibited by sections 41-1492.01 through 41-1492.05 or that any covered entity has not performed an act required by this article and its implementing rules *may institute a civil action* for preventive or mandatory relief, including an application for a permanent or temporary injunction, restraining order or other order.

A.R.S. § 41-1492.08(A) (2011) (emphasis added).  Hence his argument: "Any person" means anyone on the planet and "the Sherpa [in] Tibet, would have standing if he had

knowledge of a violation." (Doc. 45 at 34.) This Court was prepared to reject that interpretation as hopeless. But by statutory amendment that took effect on August 9, 2017, this section now reads:

> *Any aggrieved person* who is subjected to discrimination in violation of § 41-1492.01, 41-1492.02, 41-1492.03, 41-1492.04, 41-1492.05 or 41-1492.11 of this article's implementing rules *may institute a civil action* for preventive or mandatory relief, including an application for a permanent or temporary injunction, restraining order or other order.

A.R.S. § 41-1492.08(A) (2017) (emphasis added); 2017 Ariz. Sess. Laws, ch. 175, § 2. Now only an "aggrieved person" has Arizona standing, and that excludes AID. The Legislature has spared us the need for any trip to the Himalayas.

But there is more. The recent statutory amendment also shuts down Strojnik's business model of running up fees before a defendant can avoid a lawsuit by "voluntary cessation." A new subsection now adds:

> Before filing a civil action pursuant to this section that alleges a public accommodation that is operated by a private entity has a building, facility or parking lot that violates this article and except as provided by subsection F of this section, the aggrieved person or the person's attorney *shall provide written notice with sufficient detail to allow the private entity to identify and cure the violation or comply with the law.* If the private entity does not cure the violation or comply with the law within thirty days after receiving the notice, the aggrieved person may file the civil action.

A.R.S. § 41-1492.08(E) (emphasis added). In light of this provision, it is more than certain that Arizona law would not accord standing to AID for this lawsuit.

### B. It Is Certain that the Arizona Courts Would Not Allow this Case to Proceed Without Standing

Arizona has "established a rigorous standing requirement." *Fernandez v. Takota Seat Belts, Inc.,* 210 Ariz. 138, 140, 108 P3d 917, 919 (2005). "[A] litigant seeking relief in the Arizona courts must first establish standing to sue," as the standing issue is a "threshold question[]." *Bennett v. Napolitano*, 206 Ariz. 520, 525, 81 P.3d 311, 316

1    (2003).  "The requirement is important: the presence of standing sharpens the legal issues

2    presented by ensuring that true adversaries are before the court . . . ." *Sears v. Hull,* 192

3    Ariz. 65, 71, 961 P.2d 1013, 1019 (1998).   That is especially pertinent in lawyers'

4    lawsuits where the fee becomes the primary goal and the claim is the means to the goal.

5       AID argues that the Arizona courts might elect to hear this case without standing.

6    Article VI of the Arizona Constitution, the judiciary article, has no case or controversy

7    requirement, such as Article III, Section 2 of the United States Constitution does.

8    Arizona courts can waive the standing requirement "as a matter of discretion," but do so

9    "only in exceptional circumstances, generally in cases involving issues of great public

10    importance that are likely to recur.   The paucity of cases in which we have waived the

11    standing requirement demonstrates both our reluctance to do so and the narrowness of

12    this exception." *Sears,* 192 Ariz. at 71, 961 P.2d at 1019.   None of the rare cases where

13    the Arizona courts have done so is even remotely similar to this case.   In no case have the

14    Arizona courts waived standing to enforce a private statutory right for which there is a

15    plethora of injured potential plaintiffs to enforce the right for their own injury.   The

16    Arizona courts otherwise generally follow federal principles of standing.  *Id.* at 69, 961

17    P.2d at 1017 (citing federal cases).

18       Moreover, it is certain that Arizona law would not wink at standing to allow AID

19    and Strojnik to bring these injury-free lawsuits in light of the ethically suspect tactics

20    Strojnik employs.   When this suit was filed, AID demanded, among other things,

21    "payment of attorneys' fees . . . in an amount no less than $5,000." (Doc. 1-1 at 11.)  As

22    discussed above, that fee demand appears in virtually all of AID's template complaints.

23       The Arizona Rules of Professional Conduct, as provided in Rule 42 of the Rules of

24    the Arizona Supreme Court, require that a fee charged to a client be reasonable.   ER

25    1.5(a).   This does not mean that an unreasonable fee may be charged so long as the

26    opposing party ultimately foots the bill through an attorney's fee award or a settlement.

27    On the contrary, the Arizona Supreme Court has held, "The profession's ethical

28    requirements do not permit an attorney to extract unreasonable fees simply because those

1   who must bear the ultimate loss are not in a lawyer/client relationship with the attorney."

2   *Matter of Swartz*, 141 Ariz. 266, 274, 686 P.2d 1236, 1244 (1984).

3       Strojnik also maintains that all of the fees collected in his cases are donated to

4   charity, though no details are given. (Doc. 45 at 50-51.) Non-binding guidance from the

5   Arizona State Bar Association states that an otherwise unreasonable fee is not made

6   permissible by the fact it is being donated to charity. *See* State Bar of Arizona Ethics

7   Opinion No. 94-14: Donating Fee to Charity; Advertising Donation (December 1994)

8   ("Regardless of who may or may not get a portion of the fee, the ultimate consideration

9   in fee issues is that the total fee charged to a client must be reasonable."). That is

10   obvious, as the beneficiary of an attorney's duty not to charge or demand an unreasonable

11   fee is the person from who the fee is taken or demanded. It is irrelevant to the ethical rule

12   what the lawyer does with the fees wrongfully taken.

13       In this case, the complaint demanded a minimum of $5,000 in attorney's fees. In a

14   simple form complaint case like this, it is impossible that the fee for preparing and filing

15   the complaint could be $5,000. Moreover, the federal disability statute allows the award

16   of only "a reasonable attorney's fee," not any fee the attorney may demand. No fee is the

17   reasonable fee for an unnecessary lawsuit that a demand letter would have taken care of.

18   A demand for a fee beyond what is reasonable is a demand without legal basis under the

19   ADA.

20       For these reasons also, it is certain that Arizona courts would not waive the

21   standing requirement and empower Strojnik's unethical extortion of unreasonable

22   attorney's fees from defendants.

23       IT IS THEREFORE ORDERED that AID's Motion to Remand (Doc. 24) is

24   denied.

25

26   / / /

27   / / /

28   / / /

1    IT IS FURTHER ORDERED that the Clerk enter judgment dismissing this action

2  and all claims therein for lack of standing.

3    The Clerk shall terminate this case.

4    Dated: September 1, 2017.

5

6                                        Neil V. Wake
                                   Senior United States District Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "C"

2017-08-30 DRAFT
RULE 408 PROTECTED

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release ("Agreement") is made and entered into this _____ day of _____, 2017 (the "Effective Date") by and between plaintiff Fernando Gastelum ("Plaintiff") and A AND D HOSPITALITY 1 LLC d/b/a Knights Inn Phoenix North (Defendant's Hotel) in the complaint filed by Plaintiff in the United States District Court under cause number 2:17-cv-02849-SPL ("Litigation").

## RECITALS

WHEREAS, Plaintiff filed the Litigation against Defendant pursuant to Title III of the Americans With Disabilities Act and Implementing Regulations.

WHEREAS, the Parties agree that it is in their mutual interests to avoid the uncertainty and expense of this Litigation by reaching a settlement and accommodation of the certain matters encompassed herein, without any admission of law or fact.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties covenant and agree as follows:

## TERMS AND RELEASES

1. **Entry of Judgment:** The Parties shall submit to the Court a stipulated judgment which shall require Defendant to complete the following actions:

    (i) Modify its policies, practices, or procedures to ensure that individuals with disabilities can make reservations for accessible guest rooms during the same hours and in the same manner as individuals who do not need accessible rooms; and

    (ii) Identify and describe accessible features in Defendant's hotel and guest rooms at offered through its reservations service in enough detail to reasonably permit individuals with disabilities to assess independently whether the hotel and accessible guest rooms meet Plaintiff's accessibility needs and physically alter and modify accessibility elements to make the descriptions truthful, full and complete; and

    (iii) Ensure that accessible guest rooms are held for use by individuals with disabilities until all other guest rooms of that type have been rented and the accessible room requested is the only remaining room of that type; and

    (iv) Reserve, upon request, accessible guest rooms or specific types of guest rooms and ensure that the guest rooms requested are blocked and removed from all reservations systems; and

     (v) Guarantee that the specific accessible guest room reserved through its reservations service is held for the reserving customer, regardless of whether a specific room is held in response to reservations made by others; and

     (vi) Otherwise fully and completely comply with the 2010 Standards of Accessibility Design; and

     (vii)    Enter a provision granting the Court continuing jurisdiction over compliance.

2. **Time for Compliance:** The stipulated judgment shall require Defendant to complete items (1)(i) through 1(iv) within 30 days of the entry of the judgment. Defendant shall comply with item 1(vi) within 6 months of the entry of judgment.

3. **Payment of Costs, Expenses, Damages, Attorney's Fees and Punitive Damages:** Defendant shall pay costs and expenses in the amount of $1,530.94 (plus any additional costs and expenses incurred between this proposed settlement and the execution of judgment contemplated hereunder) compensatory damages in the amount of $1.00, punitive damages in the amount of $20,000.00 and attorney's fees in the amount incurred up to the time of judgment. All amounts shall be payable to Strojnik, P.C. The parties and counsel agree that the settlement amount is fair and reasonable considering the circumstances of this Litigation. The payment shall be due within 10 days of the execution of this Agreement.

4. **Compliance Review:** Upon expiration of the period of compliance, Plaintiff or Plaintiff's counsel shall be granted unfettered access to Defendant's hotel upon 3 days written notice to counsel to review all aspects of Defendant's compliance with the 2010 Standards of Accessibility Design and 28 CFR 36. In the event Plaintiff or counsel discover any element of non-compliance, Plaintiff shall have the right to petition the Court for a contempt citation. Defendant shall pay all costs, attorney's fees and reasonable expenses incurred during such inspection if, but only if, the inspection discloses any element of non-compliance.

5. **Liquidated Damages:** Each separate element of non-compliance discovered during the Compliance Review shall constitute a separate breach of this Agreement. The parties agree that Defendant shall pay to Plaintiff the sum of $5,000.00 for each separate element of non-compliance as liquidated damages. The Parties further agree that the liquidated damages term is an essential element of this Agreement and waive any legal or factual defense to its enforcement.

6. **Mutual Release.** Subject only to Defendant's timely full performance of its obligations in Paragraphs 1, 2, 3, 4 and 5, and except as otherwise qualified in this Agreement, each Party, on her/his/its own behalf, releases, discharges and acquits the other Parties and to the fullest extent applicable, each of their respective members, managers, spouses, heirs, related and affiliated entities, employees, agents, parent companies, and predecessors as well as all of their insurers, attorneys, accountants, professional employer organizations, legal successors and assigns (all of whom are referred to throughout this Agreement collectively as the "Released Parties"), from any and all charges, complaints, claims, causes of action, debts, demands, sums of money, controversies, agreements, allegations, promises, damages and liabilities of any kind or nature whatsoever, both at law and equity, known or unknown,

suspected or unsuspected, anticipated or unanticipated, arising out of the operative facts constituting the Litigation.

7. **Authority.**  The Parties represent one to the other that he/she/it has the authority to act on behalf the person or entity indicated below.

8. **No Representations.**  Each Party represents that she/he/it has had an opportunity to consult with an attorney, and by signing below represents and warrants that she/he/it has carefully read and fully understands the scope and effect of all the provisions of this Agreement.  Each Party also represents that she/he/it has not relied upon any representations or statements made by any person or entity not specifically that is not set forth in this Agreement.

9. **Severability.**  If any provision or any portion of any provision hereof or any surviving agreement becomes or is declared by a court of competent jurisdiction or arbitrator to be illegal, unenforceable, or void, this Agreement shall continue in full force and effect without said provision or portion of provision. This provision does not apply to the liquidated damages provision hereof which the parties agree is valid, enforceable, and as to which Defendant specifically waives any defenses.

10. **Entire Agreement.**  This Agreement's terms represent the entire agreement and understanding between the Parties concerning the subject matter of this Agreement.

11. **No Oral Modification.**  This Agreement may only be amended in a writing signed by the Parties.

12. **Governing Law, Exclusive: Jurisdiction and Venue.**  This Agreement shall be governed by the laws of the State of Arizona, without regard for choice-of-law provisions.  Each Party consents to personal, subject matter and all other jurisdictional requirements and venue exclusively within the State of Arizona.

13. **Counterparts, Electronic Signatures and Effective Date.**  This Agreement may be separately executed or electronically signed in separate counterparts and then exchanged by email/PDF, facsimile or delivery to the other Party or other Party(ies)' legal counsel.  The sets of exchanged counterparts shall each have the same force and effect as a fully-signed original counterpart and shall constitute an effective, binding agreement on the part of each of the Parties once the exchanged signed counterparts have each been so received by the respective legal counsel for the Parties.

DATED this ____ day of _____, 2017

**FERNANDO GASTELUM**                    **A AND D HOSPITALITY 1 LLC**

_____                    _____
Fernando Gastelum                              By:
*Electronically*                                    Its: authorized agent *electronically*

# EXHIBIT "D"

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release ("Agreement") is made and entered into this 31st day of October 2017 (the "Effective Date") by and between plaintiff Fernando Gastelum ("Plaintiff" or "Party") and ▓▓▓▓▓▓▓ ("Defendant" or "Party") ("Parties") in the complaint filed by Plaintiff in the United States District Court under cause number ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

### RECITALS

WHEREAS, Plaintiff filed the Litigation against Defendant pursuant to Title III of the Americans With Disabilities Act and Implementing Regulations and State Law counts as alleged in the Verified Complaint.

WHEREAS, the Parties agree that it is in their mutual interests to avoid the uncertainty and expense of this Litigation by reaching a settlement and accommodation of the certain matters encompassed herein, without any admission of law or fact.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties covenant and agree as follows:

### TERMS AND RELEASES

1. **Compliance:** Defendant agrees to utilize its best efforts to comply with 28 CFR § 36.302(e) with haste but in no event later than 6 months of the date of this Agreement.

2. **Settlement Payment:** Without admitting liability or fault, Defendant shall pay the sum of $18,750.00 for any costs, expenses, compensatory damages, punitive damages, attorney's fees and equitable damages to which Plaintiff may have been entitled had this Litigation proceeded to conclusion. The Payment shall be due within 10 business days of the execution of this Agreement and shall be wire transferred to Strojnik P.C. Chase Bank, 270 Park Ave., NY, NY 10017, Acct # 930329896, Routing # 122100024.

3. **Mutual Release.** In exchange for the good and valuable consideration set forth herein, the sufficiency of which is hereby acknowledged, Plaintiff hereby releases and discharges Defendant, its officers, employees, agents, successors and assigns (the "Releasees") from any and all claims, demands, and causes of action which he may have, may have had, or may hereafter raise against the Releasees with respect to this Litigation, including all claims by Plaintiff for attorneys' fees and costs, expert fees, litigation expenses, or any other amount, fee, and/or cost, with the exception of the attorneys' fees and costs required to be paid by Defendant pursuant to Paragraph 2 of this Agreement. Plaintiff further releases and discharges the Releasees from any and all claims and causes of action arising out of or relating to this Agreement which occur after any sale of the Premises.

4. **Dismissal with Prejudice:** Within fifteen (15) business days of the date this Agreement is fully executed, Plaintiff shall file a Notice of Dismissal with prejudice dismissing the Litigation with prejudice, each Party to bear such Party's own costs and fees. The Parties further agree that this Agreement shall not be filed with the Court, except as necessary for enforcement purposes, or unless otherwise required by the Court.

**Confidentiality and Non-Disparagement:** Plaintiff warrants that all the provisions of this Agreement will remain in strict confidence, except where disclosure is required by applicable law, court order or subpoena compelling disclosure. Plaintiff agrees to refrain from making any statements about the above styled action, the allegations contained therein, or this Agreement.

5. **No Admission of Liability.** Each Party understands and acknowledges that this Agreement constitutes a compromise and settlement of any and all actual or potential disputed claims between them. No action taken by any Party hereto, either previously or in connection with this Agreement, shall be deemed or construed to be (a) an admission of the truth or falsity of any actual or potential claims or (b) an acknowledgment or admission by any Party of any fault or liability whatsoever to the any Released Party (including each of the Parties) or to any third party. Parties further affirm that each has acted in good faith and has dealt fairly with the other.

6. **Authority.** The Parties represent one to the other that he/she/it has the authority to act on behalf the person or entity indicated below.

7. **Representation of Good Faith and Fair Dealing:** The parties covenant one to the other that (1) this Agreement is fair, reasonable and entered in good faith and (2) that they will abide by the terms of this Agreement in good faith and will deal with each other fairly.

8. **No Other Representations.** Each Party represents that she/he/it has had an opportunity to consult with an attorney, and by signing below represents and warrants that she/he/it has carefully read and fully understands the scope and effect of all the provisions of this Agreement. Each Party also represents that she/he/it has not relied upon any representations or statements made by any person or entity not specifically that is not set forth in this Agreement either expressly or by cross-reference.

9. **Severability.** If any provision or any portion of any provision hereof or any surviving agreement made a part hereof becomes or is declared by a court of competent jurisdiction or arbitrator to be illegal, unenforceable, or void, this Agreement shall continue in full force and effect without said provision or portion of provision.

10. **Entire Agreement.** This Agreement's terms (including any referenced pre-existing agreements' terms but only to the extent they are not inconsistent with any of them) represents the entire agreement and understanding between the Parties concerning the subject matter of this Agreement.

11. **No Oral Modification.** This Agreement may only be amended in a writing signed by the Parties.

12. **Governing Law, Exclusive: Jurisdiction and Venue.** This Agreement shall be governed by the laws of the State of Arizona, without regard for choice-of-law provisions. Each Party consents to personal, subject matter and all other jurisdictional requirements and venue exclusively within the State of Arizona.

13. **Counterparts, Electronic Signatures and Effective Date.** This Agreement may be separately executed or electronically signed in separate counterparts and then exchanged by email/PDF, facsimile or delivery to the other Party or other Party(ies)' legal counsel. The sets of exchanged counterparts shall each have the same force and effect as a fully-signed original counterpart and shall constitute an effective, binding agreement on the part of each of the Parties once the

exchanged signed counterparts have each been so received by the respective legal counsel for the Parties.

DATED this 31st day of October 2017.

**FERNANDO GASTELUM**

Fernando Gastelum
*Electronically*

# EXHIBIT "E"

**AZ Accessibility**
**Farber Consulting, LLC**
*Paul S. Farber, ICC Certified Accessibility*
*Inspector & Plans Examiner*

Phone (602) 402-9544
paul@azaccessibility.com
www.azaccessibility.com

September 6, 2017

Dipesh Patel
A and D Hospitality 1 LLC

> *Re:*   Knights Inn
>         2735 West Sweetwater Avenue
>         Phoenix, AZ

As requested, I performed an Americans with Disabilities Act (ADA) compliance survey of the referenced property on September 5, 2017. I was asked to review the allegations in Paragraph 37 of the Complaint of Fernando Gastelum, and to comment on their validity and make recommendations for compliance.

Respectfully,

Paul S. Farber, CAI/PE

KNIGHTS000001

**37a. – "There are insufficient disability parking spaces at the hotel (4 accessible for 130 total)."**

I counted 128. This requires 5 accessible spaces. You can achieve this by marking the parking space by the ramp outside Room 152 as a fully accessible space (with complaint signage and pained wheelchair icon). See Item 37d below for further ramp and access aisle changes at this space.



**37b. –"Accessible parking spaces are not properly dispersed."**

I disagree. The accessible parking spaces a fully dispersed along the north, south, east and west portions of the property. The additional space to be added at the southwest portion (See 37a) will add to the dispersion even more.

**37c. – "Multiple accessible parking spaces have no or improper signage."**

Only the accessible space at the lobby building has vertical signage. This sign sign should be replaced (missing some letters) and raised so that the bottom is at 60" minimum height. Also add a "van accessible" sign there at same minimum height. At the other four accessible spaces, add vertical signage at compliant height (no "van accessible" signs required at those spaces).

KNIGHTS000002



**37d. – "Multiple curb ramps impede accessible parking and or access aisles."**

At three locations, outside Rooms 152, 165 and 128, the accessible parking spaces have curb ramps located in access aisles and accessible parking spaces. Both access aisles and parking spaces need to be level (maximum 2.08% slope). An access aisle should be cross-hatched and level, minimum 60" width from centerline to centerline. A curb ramp cannot be located on top of the access aisle or the parking space itself.

Solution for these locations: reconfigure and restripe these areas so that there is a flat 60" wide access aisle next to the curb ramp (the curb ramp can be narrowed by removing some of the side flare and adding a curb), and relocating the accessible parking space to the other side of the new access aisle. See illustration below.



KNIGHTS000003

**37e. – "There is no accessible route from the street."**

I disagree. The steep ramped concrete sidewalk leading from the street to the property at both vehicle entrances, appears to be city property according to the Maricopa County Assessor's map. The adjacent asphalt (hotel property) is sloped appropriately (below 5% max.) and amounts to an accessible route from the city property.



**37f. – "There are no curb blockers on accessible routes."**

I am not certain which ADA requirement this refers to. To the extent it calls for curbs for edge protection on routes that are not ramps, there is no such requirement.

**37g. – "Multiple stairways are served with improper handrails."**

The handrails are largely compliant – gripping surface is somewhat wide and not rounded, and rails are a bit high in a few places. I suspect replacing these at all stairs would not be readily achievable.



**37h. – "There is no accessible route to the rear of the complex on the west side."**

I disagree. The accessible route through the center of the property connects the rear of the complex with the west side of the complex.



KNIGHTS000005

**37i. – "There are multiple curb rams with improper slopes."**

Only one curb ramp is too steep. Near the accessible parking space on the east side, the curb ramp running slope ranges from 7.0% to 9.4% (slightly in excess of the 8.33% maximum). Also, the side flares are at 25% slope, in excess of the 10% maximum. I recommend renovating this curb ramp to compliant running and side flare slope.



**37j. – "Curb ramps are not designed to be slip resistant."**

I disagree. The curb ramps are concrete and appear slip-resistant. No specific surface design is required by the ADA.

**37k. – "There are multiple access points with no curb ramps."**

This is generally not true. At one location, I would recommend a ramp: at the middle parking area outside Room 107 a built-up asphalt ramp (8.33% max. slope) would better connect the pool area with the lobby building (in front of laundry cart in photo below).

KNIGHTS000006



37l. – "There are improper changes in level on accessible routes."

This is generally not true. In one location, on the west side of the lobby building, a red metal drain cover on the concrete sidewalk is slightly raised and should be corrected so that the vertical rise in level is no more than ¼".



37m. – "Pool gate latch requires two handed operation to open."

This is true. Latch and key configuration should only require one handed operation to open the gate.

KNIGHTS000007



**37n. – "Pool gate latch it too high."**

This is true, it is at 68". ADA Standards allow 54" maximum for pool gate latches (a safety exception from the 48" typical maximum height.) I advise checking with the City of Phoenix to confirm 54" height is acceptable.

**37o. – "There is an improper threshold to the laundry room entrance."**

This is true. The existing threshold has an overall height of two inches. In alterations, beveled thresholds can have a height maximum of ¾" as long as they have beveled sides with slopes not steeper than 1:2.

KNIGHTS000008



**37p. – "Ashtrays stationed outside near pool are not accessible."**

I disagree.  Both ashtrays are within reach from the adjacent accessible concrete route.



KNIGHTS000009

# EXHIBIT "F"



# Rules of Professional Conduct

1. Client-Lawyer Relationship                                   Related Opinions

**ER 1.2.   Scope of Representation and Allocation of Authority between Client and Lawyer**

(a) Subject to paragraphs (c) and (d), a lawyer shall abide by a client's decisions concerning the objectives of representation and, as required by ER 1.4, shall consult with the client as to the means by which they are to be pursued.  A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation.  A lawyer shall abide by a client's decision whether to settle a matter.  In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.

(b) A lawyer's representation of a client, including representation by appointment, does not constitute an endorsement of the client's political, economic, social or moral views or activities.

(c) A lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances and the client gives informed consent.

(d) A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law.

Comment

**Allocation of Authority between Client and Lawyer**

[1] Paragraph (a) confers upon the client the ultimate authority to determine the purposes to be served by legal representation, within the limits imposed by law and the lawyer's professional obligations.  At the same time, a lawyer is not required to pursue objectives or employ means simply because a client may wish that the lawyer do so.  The decisions specified in paragraph (a), such as whether to settle a civil matter, must also be made by the client.  See ER 1.4(a)(1) for the lawyer's duty to communicate with the client about such decisions.  With respect to the means by which the client's objectives are to be pursued, the lawyer shall consult with the client as required by ER 1.4(a)(2) and may take such action as is impliedly authorized to carry out the representation.

[2] On occasion, however, a lawyer and a client may disagree about the means to be used to accomplish the client's objectives.  Clients normally defer to the special knowledge and skill of their lawyer with respect to the means to be used to accomplish their objectives, particularly with respect to technical, legal and tactical matters.  Conversely, lawyers usually defer to the client regarding such questions as the expense to be incurred and concern for third persons who might be adversely affected.  Because of the varied nature of the matters about which a lawyer and client might disagree and because the actions in question may implicate the interests of a tribunal or other persons, this Rule does not prescribe how such disagreements are to be resolved.  Other law, however, may be applicable and should be consulted by the lawyer.  The lawyer should also consult with the client and seek a mutually acceptable resolution of the disagreement.  If such efforts are unavailing and the lawyer has a fundamental disagreement with the client, the lawyer may withdraw from the representation.  See ER 1.16(b)(4).  Conversely, the client may resolve the disagreement by discharging the lawyer.  See ER 1.16(a)(3).

[3] At the outset of a representation, the client may authorize the lawyer to take specific action on the client's behalf without further consultation.  Absent a material change in circumstances and subject to ER 1.4, a lawyer may rely on such an advance authorization.  The client may, however, revoke such authority at any time.

[4] In a case in which the client appears to have diminished capacity, the lawyer's duty to abide by the client's decisions is to be guided by reference to ER 1.14.

**Independence from Client's Views or Activities**

[5] Legal representation should not be denied to people who are unable to afford legal services, or whose cause is controversial or the subject of popular disapproval.  By the same token, representing a
client does not constitute approval of the client's views or activities.

**Agreements Limiting Scope of Representation**

[6] The scope of services to be provided by a lawyer may be limited by agreement with the client or by the terms under which the lawyer's services are made available to the client.  Representation provided through a legal aid agency may be subject to limitations on the types of cases the agency handles.  When a lawyer has been retained by an insurer to represent an insured, for example, the representation may be limited to matters related to the insurance coverage.  A limited representation may be appropriate because the client has limited objectives for the representation.  In addition, the terms upon which representation is undertaken may exclude specific means that might otherwise be used to accomplish the client's objectives.  Such limitations may exclude actions that the client thinks are too costly or that the lawyer regards as repugnant or imprudent.

[7] Although this Rule affords the lawyer and client substantial latitude to limit the representation, the limitation must be reasonable under the circumstances.  If, for example, a client's objective is limited to securing general information about the law the client needs in order to handle a common and typically uncomplicated legal problem, the lawyer and client may agree that the lawyer's services will be limited to a brief telephone consultation.  Such a limitation, however, would not be reasonable if

the time allotted was not sufficient to yield advice upon which the client could rely. Although an agreement for a limited representation does not exempt a lawyer from the duty to provide competent representation, the limitation is a factor to be considered when determining the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation. See ER 1.1.

[8] Although paragraph (c) does not require that the client's informed consent to a limited representation be in writing, a specification of the scope of representation will normally be a necessary part of the lawyer's written communication of the rate or basis of the lawyer's fee as required by ER 1.5(b). See ER 1.0(e) for the definition of "informed consent".

[9] All agreements concerning a lawyer's representation of a client must accord with the Rules of Professional Conduct and other law. See, e.g., ERs 1.1, 1.8 and 5.6.

**Criminal, Fraudulent and Prohibited Transactions**

[10] Paragraph (d) prohibits a lawyer from knowingly counseling or assisting a client to commit a crime or fraud. This prohibition, however, does not preclude the lawyer from giving an honest opinion about the actual consequences that appear likely to result from a client's conduct. Nor does the fact that a client uses advice in a course of action that is criminal or fraudulent of itself make a lawyer a party to the course of action. There is a critical distinction between presenting an analysis of legal aspects of questionable conduct and recommending the means by which a crime or fraud might be committed with impunity.

[11] When the client's course of action has already begun and is continuing, the lawyer's responsibility is especially delicate. The lawyer is required to avoid assisting the client, for example, by drafting or delivering documents that the lawyer knows are fraudulent or by suggesting how the wrongdoing might be concealed. A lawyer may not continue assisting a client in conduct that the lawyer originally supposed was legally proper but then discovers is criminal or fraudulent. The lawyer must, therefore, withdraw from the representation of the client in the matter. See ER 1.16(a). In some cases, withdrawal alone might be insufficient. It may be necessary for the lawyer to give notice of the fact of withdrawal and to disaffirm any opinion, document, affirmation or the like. In extreme cases, a lawyer may be required to disclose information relating to the representation to avoid being deemed to have assisted the client's crime or fraud. See ER 4.1.

[12] Where the client is a fiduciary, the lawyer may be charged with special obligations in dealings with a beneficiary.

[13] Paragraph (d) applies whether or not the defrauded party is a party to the transaction. Hence, a lawyer must not participate in a sham transaction; for example, a transaction to effectuate criminal or fraudulent escape of tax liability. Paragraph (d) does not preclude undertaking a criminal defense incident to a general retainer for legal services to a lawful enterprise. The last clause of paragraph (d) recognizes that determining the validity or interpretation of a statute or regulation may require a course of action involving disobedience of the statute or regulation or of the interpretation placed upon it by governmental authorities.

[14] If a lawyer comes to know or reasonably should know that a client expects assistance not permitted by the Rules of Professional Conduct or other law or if the lawyer intends to act contrary to the client's instructions, the lawyer must consult with the client regarding the limitations on the lawyer's conduct.  See ER 1.4(a)(5).

Copyright ©2004-2018 State Bar of Arizona

# EXHIBIT "G"

**ADDENDUM B**

# STATEMENT OF ACCOUNT

**Client:**    Fernando Gastelum
**Matter:**   Pride Hospitality
**Date   :**    2018-01-13
**Rate:**    650/hr. - 0.25 minimum billing time (minimum billable time modified to 0.10
        pursuant to and *O'Neal v. Am.' Best Tire LLC* (D. Ariz., 2017)

**ATTORNEY'S FEES**

| DATE | DESCRIPTION OF SERVICES RENDERED | BY | TIME |
|------|----------------------------------|----|----|
| 2017-10-06 | In person meeting with Fernando Gastelum ("FG") regarding issues raised by the client and matters of representation. (1.75) | PS | 1.75 |
| | Discussion with Eric Gastelum ("EG") regarding websites. (0.30) | PS | 0.30 |
| 2017-10-07 | Telephone conference with EG regarding assault by Defendant involving Smith. (0.10) | PS | 0.10 |
| | Due diligence visit to hotel to review generally ADA compliance as reported by FG and EG. (1.85) | PS | 1.85 |
| | Review Assessor Information (0.10) | PS | 0.10 |
| 2017-10-08 | Review Corporation Commission Report (0.10) | PS | 0.10 |
| | Independent review of websites. (0.85) | PS | 0.85 |
| | Review FG Declaration and Due Diligence Report (0.10) | PS | 0.10 |
| | Review ADA Report and compare to EG Report (0.65) | PS | 0.65 |
| | Prepare Fee Agreement; electronic signature authorized. (0.25) | PS | 0.25 |
| | Review entire due diligence file including assessor information and corporate information in preparation for drafting Verified complaint. (0.35) | PS | 0.35 |
| | Conduct legal investigation of sufficiency of 302(e) disclosures (0.30) | PS | 0.30 |
| | Preparation, review and submission of draft Complaint to client and request for signature authority. (0.85) | PS | 0.85 |
| | Preparation, review and submission of MIDP disclosures and request for electronic signatures (0.45) | PS | 0.45 |
| | Preparation of Plaintiff's Discovery Request No 1 to defendant (0.15) | PS | 0.15 |
| | Review Doc 1- Complaint and document same in Statement of Account (0.10) | PS | 0.10 |
| 2017-10-10 | Review Doc 2- Summons Submitted and document in Statement of Account (0.10) | PS | 0.10 |
| | Review Doc 3- Notice of Availability of US Magistrate Judge and document in Statement of Account (0.10) | PS | 0.10 |

2375 EAST CAMELBACK ROAD - SUITE 600 – PHOENIX – ARIZONA – 85016
CELL: 602.524.6602 – EMAIL: PS@STROJNIK.COM
WEBSITE: WWW.STROJNIK.COM

**ADDENDUM B**

# S T A T E M E N T   O F   A C C O U N T

**Client:**    Fernando Gastelum
**Matter:**    PCH North Phoenix I LLC
**Date   :**    2018-02-11
**Rate   :**    650/hr. - 0.25 minimum billing time (reduced to 0.10)

**ATTORNEY'S FEES**

| DATE | DESCRIPTION OF SERVICES RENDERED | BY | TIME |
|------|----------------------------------|-----|------|
| 2017-10-09 | In person meeting with FG regarding issues raised by the client and matters of representation. Document same in Statement of Account. (1.50) | PS | 1.50 |
| 2017-10-09 | Discussion with EG regarding websites. Document same in Statement of Account. (0.25) | PS | 0.25 |
| 2017-10-09 | Due diligence visit to hotel to review generally ADA compliance as reported by EG. Document same in Statement of Account. (2.50) | PS | 2.50 |
| 2017-10-10 | Review Assessor Information. Compare same with CC Information. Document same in Statement of Account. (0.15) | PS | 0.14 |
| 2017-10-10 | Review CC Information. Document same in Statement of Account. | PS | 0.10 |
| 2017-10-10 | Independent review of websites. Document same in Statement of Account. (0.75) | PS | 0.75 |
| 2017-10-10 | Review FG Declaration. Document same in Statement of Account. (0.10) | PS | 0.10 |
| 2017-10-10 | Review Due Diligence Report. Document same in Statement of Account. (0.10) | PS | 0.10 |
| 2017-10-10 | Review call recording FG made to hotel. Relisten. Document same in Statement of Account. (0.20) | PS | 0.20 |
| 2017-10-10 | Review ADA Report and compare same with EG Report. Document same in Statement of Account. (0.65) | PS | 0.65 |
| 2017-10-10 | Prepare Fee Agreement; electronic signature authorized. Document same in Statement of Account. (0.25) | PS | 0.25 |
| 2017-10-10 | Review entire due diligence file including assessor information and corporate information in preparation for drafting Verified complaint. Document same in Statement of Account. (0.35) | PS | 0.35 |
| 2017-10-10 | Preparation, review and submission of draft Complaint to client and request for signature authority. Document same in Statement of Account. (1.35) | PS | 1.35 |

2375 EAST CAMELBACK ROAD - SUITE 600 – PHOENIX – ARIZONA – 85016
CELL: 602.524.6602 – EMAIL: PS@STROJNIK.COM
WEBSITE: WWW.STROJNIK.COM

**ADDENDUM B**

# STATEMENT OF ACCOUNT

**Client:**   Fernando Gastelum
**Matter:**   Knights Inn Phoenix North
**Date   :**   2018-02-18
**Rate   :**   650/hr. - 0.25 minimum billing time

ATTORNEY'S FEES

| DATE | DESCRIPTION OF SERVICES RENDERED | BY | TIME |
|---|---|---|---|
| 2017-08-22 | Review 2017-08-22 Client Due Diligence Report. Document same in Statement of Account | PS | 0.10 |
| 2017-08-22 | Review 2017-08-22 from Eric Gastelum violations and compare to 2010 Standards of Accessibility Design. Document same in Statement of Account. | PS | 0.55 |
| 2017-08-22 | Review 2017-08-22 From EG Websites. Review websites. Document same in Statement of Account. | PS | 0.75 |
| 2017-08-22 | Review call_14-58-11_OUT_+16029380286. Document same in Statement of Account | PS | 0.10 |
| 2017-08-23 | In person consultation with FG regarding the case and representation. Discussion regarding discovery and litigation process generally. Document same in Statement of Account. (2.75) | PS | 2.75 |
| 2017-08-23 | Conduct pre-litigation due diligence view of property. Document same in Statement of Account. (2.85) | PS | 2.85 |
| 2017-08-23 | Conduct additional pre-litigation due diligence regarding websites. Document same in Statement of Account. (0.50) | PS | 0.50 |
| 2017-08-23 | Review entire due diligence file in preparation for drafting Verified complaint. Document same in Statement of Account. (0.35) | PS | 0.35 |
| 2017-08-23 | Preparation, review and submission of draft Complaint to client and request for signature authority. Document same in Statement of Account. (0.75) | PS | 0.75 |
| 2017-08-23 | Preparation, review and submission of MIDP disclosures. Document same in Statement of Account. (1.00) | PS | 1.00 |
| 2017-08-23 | Review signature authority. Submit for filing. Document same in Statement of Account. (0.10) | PS | 0.10 |
| 2017-08-23 | Preparation, review and submission of collateral paperwork-summons, civil cover sheet. Document same in Statement of Account. (0.20) | PS | 0.20 |
| 2017-08-23 | Review Doc 1- Verified Complaint. Document same in Statement of Account. (0.10) | PS | 0.10 |

Page | 7

2375 EAST CAMELBACK ROAD - SUITE 600 – PHOENIX – ARIZONA – 85016
CELL: 602.524.6602 – EMAIL: PS@STROJNIK.COM
WEBSITE: WWW.STROJNIK.COM

EXHIBIT "H"

Lindsay G. Leavitt – 029110
Lleavitt@jsslaw.com
JENNINGS, STROUSS & SALMON, P.L.C.
A Professional Limited Liability Company
One East Washington Street
Suite 1900
Phoenix, Arizona 85004-2554
Telephone: (602) 262-5911

Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Fernando Gastelum, | No. 2:17-cv-02849-SPL |
| Plaintiff | **DECLARATION OF DIPESH PATEL** |
| vs. | |
| A and D Hospitality 1, LLC d/b/a Knights Inn Phoenix North, | |
| Defendant | |

I, Dipesh Patel, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    My name is Dipesh Patel. I am more than twenty-one (21) years of age, of sound mind, and capable of making this declaration. The facts, statements, and circumstances set forth in this declaration are based on my personal knowledge and are true and correct.

2.    I am, and at all relevant times was, the Manager of A and D Hospitality 1, LLC d/b/a Knights Inn Phoenix North ("A and D"). A and D owns and operates a Knights Inn franchise located at 2735 W. Sweetwater Ave., Phoenix AZ 85029.

3.    My primary job duties as the Manager of A & D are to oversee the day to day operations of the hotel as well as all corporate, legal and other management issues.

4.    On or about August 27, 2017, it was brought to my attention that A and D had been served with a Summons and Complaint by the Plaintiff in this matter.

5979457v1(66920.1)

1     5.    After reviewing the allegations and speaking with my counsel, I

2  immediately hired Mr. Paul Farber, a certified accessibility expert, to review the

3  allegations and verify whether they were valid.

4     6.    Mr. Farber prepared a report indicating that only seven (7) out of the

5  sixteen (16) alleged ADA violations were valid.

6     7.    I immediately set about arranging for the valid allegations identified in

7  the Plaintiff's Complaint to be remedied.

8     8.    The Plaintiff has also alleged that he encountered ADA violations on

9  our website and online reservation platform. A and D does not own or have control

10  over the website. The website is owned and controlled by Wyndham Hotels and

11  Resorts. We are making our best efforts to inform Wyndham Hotels and Resorts

12  about any ADA violations on the website, but ultimately, it is in their control, not A

13  and D's, whether the violation(s) will be remedied.

14     9.    A and D takes ADA compliance very seriously. We strive to provide

15  fully compliant accommodations, not just to avoid lawsuits like this one, but also

16  because it's the right thing to do for our guests with disabilities.

17     10.    Mr. Gastelum did not provide advance notice to A and D before filing

18  his lawsuit. Had Mr. Gastelum provided A and D with notice of the alleged violations

19  prior to filing his lawsuit, I would have immediately set about remedying the alleged

20  violations. In other words, filing a lawsuit was totally unnecessary.

21

22  I declare under penalty of perjury under the laws of the United States of America that

23  the foregoing is true and correct.

24     DATED this 5th day of March, 2018.

25

26

27

28

# EXHIBIT "I"



**OLABISI ONISILE WHITNEY** represents small businesses as outside counsel. Her practice also focuses on family law and mediation. She is a member of the State Bar of Arizona Communications Advisory Committee. She can be reached at (602) 687-6248. A special thanks to Christopher Groh, a second year law student and paralegal at Onisile Law Firm, PLLC, for his assistance with this article.

**RICK DeBRUHL** is the Chief Communications Officer for the State Bar of Arizona.

# ATTORNEY SURVEY

## ARIZONA LAWYERS REPORT ON ECONOMICS OF PRACTICE

### BY OLABISI ONISILE WHITNEY & RICK DeBRUHL

If you're an attorney in Arizona, odds are you're making more than $100,000 per year, billing $275 per hour and doing 21 hours of pro bono per year.

But the best news is that you're probably taking two weeks of vacation every year to get away from it all.

Those are just some of the numbers that came out of the *2016 Economics of Law Practice in Arizona* survey. The State Bar of Arizona does this survey every three years. It provides a snapshot of how our legal profession is doing. It helps courts decide how much to award in legal fees, and it gives law firm administrators guidance when hiring new staff.

While the survey has been around since 2001, this year's version includes significant changes. To start with, a new consultant called Readex Research was used. It is considered one of the nation's top research companies. The company's roots go back to 1947, and each year it conducts more than 500 research projects for customers in the U.S., Canada, and Europe.

Another difference came in the way some

ECONOMICS OF PRACTICE

### Educational Debt Held
*(Among Those Who Had Educational Debt at Graduation)*

Upon graduation from law school, approximately how much educational
debt did you have from law school?



| | |
|---|---|
| $200,000 or more | 4% |
| $150,000 - $199,999 | 10% |
| $125,000 - $149,999 | 7% |
| $100,000 - $124,999 | 10% |
| $75,000 - $99,999 | 12% |
| $50,000 - $74,999 | 15% |
| $25,000 - $49,999 | 16% |
| less than $25,000 | 25% |

mean: $75,800
median: $63,500

THE MEDIAN HOURLY BILLING RATE IN 2016 WAS $275. THREE YEARS AGO THE MEDIAN ANSWER WAS $255. THAT METRIC HAS STEADILY CLIMBED IN THE FOUR PREVIOUS SURVEYS.

For the first time we asked about benefits. To start with, 51 percent of full-time attorneys said they were eligible to receive some type of compensation beyond their base salary. Bonuses were the most common cash benefit, with 35 percent of full-time attorneys on the receiving end. Profit sharing was enjoyed by another 15 percent, and five percent received commission or incentive pay.

For law firms that have associates, 69 percent get a salary and a possible year-end bonus. Only 14 percent receive only a salary with no additional financial compensation.

Of course money isn't everything. That's why we asked how much vacation attorneys are taking. Ninety percent of full-time attorneys say they're taking at least a week, with the median landing at a solid two weeks. More than a quarter (27 percent) are taking three or more weeks away from the job.

Common benefits beyond compensation and vacation are health insurance (83 percent), sick leave (61 percent), and retirement plan contributions (55 percent). Thirty-two percent say they get new-child leave, and 20 percent are getting either gym

membership discounts or an on-site gym.

The median hourly billing rate in 2016 was $275. Three years ago the median answer was $255. While the question was framed identically this year, as mentioned above the survey methodology changed slightly. Having said that, that metric has steadily climbed in the four previous surveys, and it's not unreasonable to believe that the hourly billing rate has gone up again.

It's probably no surprise that attorneys in Maricopa County bill more per hour, as do attorneys who have been practicing longer. Plaintiff's personal injury attorneys had the highest median rate at $312 per hour, while the lowest amount for practice areas included in our survey was litigation defense at $257 per hour.

Thirty-two percent of attorneys working in private practice say they expect their firm to hire a new attorney in the next year. Twenty-nine percent of private practice attorneys say they expect to see a greater demand for legal services during the next three years, whereas only 16 percent expect a decrease.

According to the survey six percent of the attorneys say they can't collect all of their fees. When a client doesn't pay, 61 percent say they take action, ranging from sending demand letters (43 percent) to turning the account over to a collection agency (7 percent).

In regard to student loan debt, further inquiry may be needed to fully understand the answers. In the future the State Bar will break down



FULL REPORT AVAILABLE

The complete *2016 Economics of Law Practice in Arizona* survey is 85 pages and is available for purchase. Contact Pat Gallanosa at 602-340-7226.

### Typical Hourly Rate by Number of Years Licensed and Primary Practice Area

What is your typical hourly rate?

the numbers to understand how each age range is affected. What we do know is that 77 percent of our members had law school debt upon graduation. Eighty-nine percent of members who have been out of law school less five years started with an average amount of $132,800. Currently, they say they have paid off less than 17 percent. Interestingly, attorneys who have been practicing between 15 and 19 years say they are still carrying nearly 26 percent of their law school student loan debt.

There is one number that gives concern. It's the amount of time that Arizona attorneys report doing pro bono work. Three years ago the median number was 24 hours per year. This year, attorneys reported doing 21 hours. While the survey methodology is different, it's important to point out that nearly every other comparable category this year has seen an increase. This is one area that has gone down. Considering that the Arizona Supreme Court's goal is to have every attorney in our state performing at least 50 hours of pro bono per year, it appears we have a long way to go.

Overall, the numbers appear to tell a positive story about the economics of Arizona's legal profession. When this survey was conducted in 2010, attorneys' median wage was reported to drop from three years earlier. Since then, the numbers have climbed. Right now there's no reason to believe that things will change in the next three years. AZ

| | | NUMBER OF YEARS LICENSED | | | | | |
|---|---|---|---|---|---|---|---|
| | TOTAL | | | | | | |
| median hourly rate | $275 | $226 | $255 | $279 | $288 | | |
| | | PRIMARY PRACTICE AREA | | | | | |
| | TOTAL | | | | | | |
| median hourly rate | $275 | $257 | $259 | $266 | $274 | $289 | $299 |
| | | PRINCIPAL OFFICE LOCATION | | | | | |
| | TOTAL | | | | | | |
| median hourly rate | $275 | $200 | $225 | $271 | $282 | $250 | |

☐=$260 - $279   ▨=$280 $299   ▩=$300+

# Yes, Keep Your Financial Advisor

*If you prefer, we'll work with your advisors, not replace them. We'll be the corporate trustee. Your client keeps his investment advisor and CPA.*

We are a full service community bank trusted for generations offering a full range of trust and investment management services, including Special Needs Trusts, Conservatorships, Third-party Advisory Services and more.

**Our personal attention makes the difference.**



**Craig Ealy**
**President of Trust**
480-214-4295
cealy@firstintlbank.com



**James D. Boardman**
**Senior Vice President**
**Senior Trust Officer**
480-214-4294
jboardman@firstintlbank.com



FIRST
INTERNATIONAL
BANK & TRUST

*live first*

2231 E. Camelback Rd., Suite 107, Phoenix | **Trust & Wealth Management Services**

# EXHIBIT "J"

WO                    IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

THERESA BROOKE, a married woman        )
dealing with her sole and separate claim,  )
                                       )
                        Plaintiff,     )
                                       )
        vs.                            )
                                       )
A-VENTURES, LLC, a Colorado limited    )
liability company, d/b/a www.a-lodge.com,  )
                                       )      No. 2:17-cv-2868-HRH
                        Defendant.     )
_____)

## O R D E R

### Motion for Default Judgment

Plaintiff moves for default judgment.[1] This motion is opposed.[2] Oral argument was requested but is not deemed necessary.

### Background

Plaintiff Theresa Brooke is "a disabled woman confined to a wheelchair" who requires an ADA-accessible room when she travels.[3] Defendant A-Ventures, LLC owns/operates the

---

[1]Docket No. 16.

[2]Docket No. 17.

[3]Verified Complaint at 2-3, ¶¶ 4, 9-10, Docket No. 1.

-1-

Boulder Adventure Lodge in Boulder, Colorado.[4] Defendant maintains a website for the hotel at www.a-lodge com.[5]

Plaintiff alleges that she went to defendant's website for the purpose of booking a room but was unable to book an ADA-accessible room for her selected dates as well as for "a few different dates farther out."[6] Plaintiff thus alleges that defendant has violated 28 C.F.R. § 36.302(e)(1)(i), which requires that

> [a] public accommodation that owns ... or operates a place of lodging shall, with respect to reservations made by any means, including by telephone, in-person, or through a third party ... [m]odify its policies, practices, or procedures to ensure that individuals with disabilities can make reservations for accessible guest rooms during the same hours and in the same manner as individuals who do not need accessible rooms[.]

On August 24, 2017, plaintiff commenced this action in which she asserts a single cause of action under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181-12189.  Plaintiff expressly alleges that defendant violated Title III of the ADA because defendant was not complying with 28 C.F.R. § 36.302(e)(1)(i).[7]  Although defendant believes that plaintiff has also alleged that its website "did not identify and describe the accessible features of the lodge in enough detail to reasonably permit Mrs. Brooke to assess independ-

---

[4]Id. at 2, ¶ 2.

[5]Id.

[6]Id. at 4, ¶ 14.

[7]Id. at 5, ¶¶ 23-24.

-2-

ently whether A-Ventures met her accessibility needs[,]"[8] nowhere in plaintiff's complaint does she make any such allegations. Plaintiff's claim is based only on her inability to book an ADA-accessible room on defendant's website. Her claim is not based on allegations that defendant had failed to "[i]dentify and describe the accessible features" in its guest rooms "in enough detail to reasonably permit individuals with disabilities to assess independently whether a given hotel or guest room meets his or her accessibility needs[.]" 28 C.F.R. § 36.302(e)(1)(ii). In other words, plaintiff's claim is based solely on 28 C.F.R. § 36.302(e)(1)(i) and whether or not defendant has complied with 28 C.F.R. § 36.302(e)(1)(ii) is not at issue here.

In her complaint, plaintiff seeks a declaration that defendant violated Title III of the ADA because its website did not comply with 28 C.F.R. § 36.302(e)(1)(i), injunctive relief ordering defendant to modify its website to allow for the reservation of ADA-accessible rooms, closure of defendant's website until defendant has complied with the ADA, attorney's fees, costs, and whatever other relief the court deems just and appropriate.

On September 20, 2017, plaintiff applied for entry of default.[9] On September 21, 2017, the clerk of court entered default against defendant.[10]

Plaintiff now moves for entry of default judgment against defendant.

---

[8]Defendant's Response to Plaintiff's Motion for Default Judgment at 1-2, Docket No. 17.

[9]Docket No. 9.

[10]Docket No. 10.

## Discussion

"Federal Rule of Civil Procedure 55(b)(2) permits a court, following default by a defendant, to enter default judgment in a case." Craigslist, Inc. v. Naturemarket, Inc., 694 F. Supp. 2d 1039, 1051 (N.D. Cal. 2010). "When considering whether to enter a default judgment, a court has 'an affirmative duty to look into its jurisdiction over both the subject matter and the parties.'" Golden Scorpio Corp. v. Steel Horse Saloon I, Case No. CV–08–1781–PHX–GMS, 2009 WL 976598, at *3 (D. Ariz. April 9, 2009) (quoting In re Tuli, 172 F.3d 707, 712 (9th Cir. 1999)).

First, defendant seems to suggest that plaintiff does not have standing to bring her Title III ADA claim. "Standing is an essential element of a federal court's subject matter jurisdiction." Byler v. Deluxe Corp., 222 F. Supp. 3d 885, 893 (S.D. Cal. 2016). "To establish standing under the ADA, plaintiff[] must demonstrate that [she has] suffered an injury in fact, that the injury is traceable to the challenged action of the [d]efendant and that the injury can be redressed by a favorable decision." Hubbard v. Rite Aid Corp., 433 F. Supp. 2d 1150, 1162 (S.D. Cal. 2006).

Defendant argues that plaintiff has suffered no injury in fact because she could have never stayed at defendant's hotel. In her complaint, plaintiff alleges that she "cannot lodge at a hotel or inn without the commonly-acceptable features of an ADA-accessible room such as a roll-in shower, grab bars surrounding the toilet, shower transfer chairs, wider entry-ways to

-4-

accommodate [p]laintiff's wheelchair, and other commonly-accepted ADA features."[11] However, defendant's hotel does not have roll-in showers nor is it required to do so under the ADA. Hotels with fewer than 50 rooms are not required to have roll-in showers in any of their ADA-accessible rooms.[12]  Defendant's hotel has 29 rooms.[13]

The fact that defendant's hotel is not required to provide roll-in showers does not mean that plaintiff has not alleged an injury in fact. Plaintiff did not allege that she must have a roll-in shower in order to stay at a hotel. Rather, she alleged that a roll-in shower was one of the features commonly found in an ADA-accessible room and that she must reserve an ADA-accessible room. Here, the essence of plaintiff's claim is that she suffered in injury in fact because she was unable to reserve an ADA-accessible room on defendant's website. Plaintiff has adequately alleged that she has standing to pursue a Title III ADA claim for declaratory and injunctive relief.

Defendant next argues that this court no longer has subject matter jurisdiction because this case is moot. "'A case becomes moot—and therefore no longer a Case or Controversy for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'" Rosebrock v. Mathis, 745 F.3d 963, 971 (9th Cir.

---

[11]Verified Complaint at 3, ¶ 10, Docket No. 1.

[12]Exhibit K at 1, Defendant's Response to Plaintiff's Motion for Default Judgment, Docket No. 17.

[13]Declaration of Asa Firestone at ¶ 3, Exhibit E, Defendant's Response to Plaintiff's Motion for Default Judgment, Docket No. 17.

2014) (quoting Already, LLC v. Nike, Inc., 133 S. Ct. 721, 726 (2013)). "Because a private

plaintiff can sue only for injunctive relief (i.e., for removal of the barrier) under the ADA, a

defendant's voluntary removal of alleged barriers prior to trial can have the effect of mooting

a plaintiff's ADA claim." Oliver v. Ralphs Grocery Co., 654 F.3d 903, 905 (9th Cir. 2011)

(internal citations omitted).

Defendant argues that this case is moot because it is now fully compliant with 28 C.F.R.

§ 36.302(e)(1)(i). In support of this argument, defendant offers screenshots from its website

which show that a guest can now book an ADA Queen room on the website.[14]

However, "'[t]he voluntary cessation of challenged conduct does not ordinarily render

a case moot because a dismissal for mootness would permit a resumption of the challenged

conduct as soon as the case is dismissed.'" Rosebrock, 745 F.3d at 971 (quoting Knox v. Serv.

Emps. Int'l Union, Local 1000, 132 S. Ct. 2277, 2287 (2012)). "But voluntary cessation can

yield mootness if a 'stringent' standard is met: 'A case might become moot if subsequent

events made it absolutely clear that the allegedly wrongful behavior could not reasonably be

expected to recur.'" Id. (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC),

Inc., 528 U.S. 167, 189 (2000)). "The party asserting mootness bears a 'heavy burden' in

meeting this standard." Id. (quoting Friends of the Earth, 528 U.S. at 189).

---

[14]Exhibit A, Defendant's Response to Plaintiff's Motion for Default Judgment, Docket
No. 17.

Defendant argues that it can meet this heavy burden. Defendant contends that it has no intention of undoing the changes it has made to its website. In support of this contention, defendant offers the declaration of Asa Firestone, the managing partner of defendant. Firestone avers that he can "state with absolute certainty that the updates made to A-Lodge's website are permanent – they will not be removed at any time. I personally oversee the content of the website; substantive changes cannot be made without my approval."[15]   As further evidence that defendant will not fall out of compliance, Firestone avers that he "enacted a new company policy ... regarding the reservation process for accessible guest rooms."[16]   That policy provides that "A-Lodge will ensure that individuals with disabilities can make reservations for accessible guest rooms online, over the telephone or in person during the same hours as individuals who do not need accessible rooms."[17]

Firestone's declaration is not sufficient to show that defendant's violation of 28 C.F.R. § 36.302(e)(1)(i) will not happen again. A change to a website is akin to a change in policy, which courts have found are not sufficient to meet the stringent standard for proving a case has been mooted by a defendant's voluntary conduct if the policy "could be easily abandoned or altered in the future." Bell v. City of Boise, 709 F.3d 890, 901 (9th Cir. 2013). Defendant's

---

[15]Firestone Declaration at ¶ 9, Exhibit E, Defendant's Response to Plaintiff's Motion for Default Judgment, Docket No. 17.

[16]Id. at ¶ 8.

[17]Policy Regarding Resevations [sic] of Accessible Guestrooms, Exhibit C, Defendant's Response to Plaintiff's Motion for Default Judgment, Docket No. 17.

website could easily be abandoned or changed in the future,[18] as could its new internal policy.

This case is comparable to <u>Reyes v. Educational Credit Management Corporation</u>, —

F.R.D. —, 2017 WL 4169720 (S.D. Cal. 2017). There, Reyes brought a class action against

ECMC "alleging violations of California's Invasion of Privacy Act...." <u>Id.</u> at *1. Reyes'

claims arose out of ECMC's "internal policy of recording all inbound and outbound calls that

reach a live customer service representative using" the Noble Phone System. <u>Id.</u> It was

undisputed that the Noble Phone System was incorrectly programmed for thirteen phone lines

during the relevant time period such that the caller was not notified that his phone call was

being recorded. <u>Id.</u> ECMC argued that Reyes' claim for injunctive relief was moot because

it had corrected the error in the programming and "adopted a written procedure to attempt to

avoid this type of conduct in the future." <u>Id.</u> at *13. The court rejected ECMC's argument,

explaining that

> [t]he correction of the error alone is unconvincing—it is not
> implausible that the settings on the Noble Phone System that led
> to this lawsuit could be again incorrectly programmed in [the]
> future. For example, a software or hardware update could require
> the Noble Phone System's settings to be reconfigured, and the
> same mistake could be made, as it was made previously for
> thirteen separate phone lines.
>     The same is true for ECMC's new written policy. ...
> Committing [a] policy to writing may be an improvement, but this
> change does not demonstrate it is absolutely clear that the
> allegedly wrongful behavior could not reasonably be expected to

---

[18] <u>See</u> Expert Opinion of Thomas Leyba at 2-3 ¶¶ 11-12, 17-18, Exhibit 1, Plaintiff's
Reply to Defendant's Response to Plaintiff's Motion for Default Judgment, Docket No. 20.

> recur. The company similarly does not show this policy could not
> be easily abandoned or altered in the future.

Id. at *14 (internal citations omitted).

Similarly here, all defendant has done is change its website and adopt a new internal

policy, both of which could easily be changed in the future. Defendant has not met its heavy

burden of showing that it is absolutely clear that its wrongful behavior could not reasonably

be expected to recur. This case is not moot.

Turning then to the merits of plaintiff's motion for default judgment, "[t]he district

court's decision whether to enter a default judgment is a discretionary one." Aldabe v. Aldabe,

616 F.2d 1089, 1092 (9th Cir. 1980). Factors the court considers

> in exercising discretion as to the entry of a default judgment
> include: (1) the possibility of prejudice to the plaintiff, (2) the
> merits of plaintiff's substantive claim, (3) the sufficiency of the
> complaint, (4) the sum of money at stake in the action; (5) the
> possibility of a dispute concerning material facts; (6) whether the
> default was due to excusable neglect, and (7) the strong policy
> underlying the Federal Rules of Civil Procedure favoring deci-
> sions on the merits.

Eitel v. McCool, 782 F.2d 1470, 1471–72 (9th Cir. 1986).

Based upon the parties' arguments as to the Eitel factors and the procedural status of

this case - defendant's default, the court finds:

1)      If a default judgment is not entered, plaintiff "will likely be without other

recourse for recovery" because defendant has declined to respond to her complaint. PepsiCo,

Inc. v. California Security Cans, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002).

2)     Plaintiff is disabled within the meaning of the ADA; defendant owns or operates a place of public accommodations; plaintiff was denied public accommodation by defendant because she was not able to book an ADA-accessible room in the same manner as a person could book a non-ADA-accessible room; and allowing plaintiff equal access would be readily achievable.

3)     The sum of money at stake here (plaintiff's request for $8,260 in fees and costs) is not unreasonable in relation to defendant's conduct.

4)     There is no possibility that there are any disputes of material fact because plaintiff's allegations must be accepted as true and because defendant appears to have conceded the ADA violation at issue here.

5)     There is no possibility of excusable neglect as defendant is aware of this lawsuit and the instant motion was sent to defendant.

6)     Defendant has substantially admitted the merit of plaintiff's Title III ADA claim by modifying its on-line reservation system in response to plaintiff's complaint.

All of the Eitel factors weigh in favor of entering a default judgment, but "[b]efore a court can enter default judgment against a defendant, the plaintiff must [also] satisfy the procedural requirements for default judgments set forth in Rules 54(c) and 55 of the Federal Rules of Civil Procedure[.]" Vogel v. Rite Aid Corp., 992 F. Supp. 2d 998, 1006 (C.D. Cal. 2014). "Rule 55(b)(2) requires service on the defaulting party if that party has appeared in the action." Id. at n.19. Here, defendant has been served with notice of plaintiff's motion for

-10-

default judgment. Rule 54(c) provides that "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." To determine if plaintiff has satisfied Rule 54(c), the court considers the relief that she is now requesting.

First, plaintiff requests nominal damages in an amount to be determined by the court. Although plaintiff did not expressly request nominal damages in her complaint, she did request "whatever other relief the [c]ourt deems just, equitable, and appropriate."[19] "That is sufficient to permit the plaintiff to pursue nominal damages." Yniguez v. State, 975 F.2d 646, 647 n.1 (9th Cir. 1992). The question here is whether nominal damages are available in a Title III ADA case. The only remedy under Title III of the ADA is equitable relief; damages are not available. 42 U.S.C. § 2000a-3. However, in Bayer v. Neiman Marcus Group, Inc., 861 F.3d 853, 874 (9th Cir. 2017), the Ninth Circuit held that "§ 12203 [of the ADA[20]] authorizes courts to award nominal damages as equitable relief when complete justice requires." This is not a § 12203 case and the court declines to extend the holding of Bayer to a Title III ADA case.

But even if the court were inclined to extend the holding of Bayer, complete justice would not require an award of nominal damages in this case. In Bayer, the court found that complete justice required an award of nominal damages, in large part because

> Bayer waited more than six years after he filed the charge alleging
> Neiman Marcus interfered with his ADA rights to receive the
> right-to-sue letter he needed to initiate this suit from the EEOC,

---

[19]Verified Complaint at 7, Docket No. 1.

[20]Section 12203 is in Title IV of the ADA and is the anti-retaliation and coercion provision.

> including four years <u>after</u> the EEOC determined there was reasonable cause to believe Neiman Marcus had discriminated against him in violation of the ADA.

<u>Id.</u> at 874. Here, all plaintiff did was file a cookie-cutter complaint against defendant, after which defendant promptly remedied the ADA violation at issue. Under such circumstances, plaintiff would not be entitled to nominal damages.

Although plaintiff does not expressly address her request for declaratory relief in her briefing, plaintiff is entitled to a declaration that, at the time this lawsuit was filed, defendant was violating Title III of the ADA because its hotel reservations website did not afford disabled persons equal access to defendant's public accommodations.

Plaintiff also seeks injunctive relief. Under the ADA, "injunctive relief shall include an order to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities...." 42 U.S.C. § 12188(a)(2). Although defendant represents that it has already complied with 28 C.F.R. § 36.302(e)(1)(i), plaintiff is entitled to an injunction directing defendant to ensure that it is, and that it remains, in compliance with 28 C.F.R. § 36.302(e)(1)(i).

Next, plaintiff seeks an award of attorney's fees. "The attorney's fee provision of the ADA allows the court to award a prevailing private party 'a reasonable attorney's fee, including litigation expenses, and costs.'" <u>Brown v. Lucky Stores, Inc.</u>, 246 F. 3d 1182, 1190 (9th Cir. 2001) (quoting 42 U.S.C. § 12205) (emphasis omitted)). "[C]ourts generally apply the lodestar method to determine what constitutes a reasonable attorney fee[.]" <u>Bravo v. City</u>

-12-

of Santa Maria, 810 F.3d 659, 665–66 (9th Cir. 2016). "Under the lodestar method, the court multiplies a reasonable number of hours by a reasonable hourly rate." Stanger v. China Electric Motor, Inc., 812 F.3d 734, 738 (9th Cir. 2016) (citation omitted).

As an initial matter, defendant argues that plaintiff's request for attorney's fees should be denied in its entirety on the basis of a September 1, 2017 order in Advocates for Individuals with Disabilities, LLC v. MidFirst Bank, Case No. CV 16-01969-PHX-NVW.[21]  There, the plaintiffs had brought claims under the ADA and the Arizonians with Disabilities Act ("AZDA") based on allegations that "MidFirst failed to maintain various parking lot specifications ... required by state and federal disability laws."[22]  The court noted that "the discrepancies in parking signage and striping here were minor, even trivial" and that "MidFirst immediately corrected them[.]"[23]

The court declines to apply MidFirst Bank to this case.  The MidFirst Bank court primarily took issue with the plaintiffs' request for $5000 in attorney's fees because the ADA violations could have been remedied with a demand letter or a phone call.  But Title III of the ADA does not contemplate that the statute will be enforced via demand letters and phone calls. Rather, it contains a private right of action. 42 U.S.C. § 12188(a). Plaintiff was exercising her

---

[21]A copy of this decision is attached as Exhibit F to Defendant's Response to Plaintiff's Motion for Default Judgment, Docket No. 17.

[22]Exhibit F at 1-2, Defendant's Response to Plaintiff's Motion for Default Judgment, Docket No. 17.

[23]Id. at 2.

statutory right to file a lawsuit to enforce Title III and the fact that she did so does not mean that she is not entitled to any attorney's fees. Moreover, defendant's failure to comply with 28 C.F.R. § 36.302(e)(1)(i) was not trivial.

Defendant next argues that plaintiff's request for attorney's fees should be denied in its entirety because opposing counsel's conduct and unreasonable settlement demands prevented this case from settling at the outset. This argument focuses on a September 2017 phone call between plaintiff's counsel, Peter K. Strojnik, and Maury Birdwell, who serves as defendant's outside general counsel in Colorado. Mr. Strojnik accused Mr. Birdwell of being aggressive, sounding intoxicated, engaging in negative name-calling, and threatening him during the phone call.[24] Mr. Birdwell accused Mr. Strojnik of yelling, using profanity, and generally being unprofessional during the phone call.[25] An email exchange between the two on September 9, 2017 did nothing to remedy the situation.[26]

The fact that counsel for the parties have a poor relationship is not a sufficient reason to deny plaintiff's request for attorney's fees in its entirety. The question here is not whether counsel for either party behaved badly but rather whether the amount of attorney's fees plaintiff is requesting is reasonable.

---

[24]Declaration of Peter Strojnik [etc.] at 4, ¶ 10, which is appended to Motion for Default Judgment, Docket No. 16.

[25]Declaration of Maury Birdwell at ¶ 5, Exhibit G, Defendant's Response to Plaintiff's Motion for Default Judgment, Docket No. 17.

[26]Exhibit H, Defendant's Response to Plaintiff's Motion for Default Judgment, Docket No. 17.

Turning then to the lodestar calculation, "[g]enerally, when determining a reasonable hourly rate, the relevant community is the forum in which the district court sits." Camacho v. Bridgeport Financial, Inc., 523 F.3d 973, 979 (9th Cir. 2008). Counsel for plaintiff proposes an hourly rate of $650.00 based upon his skill, experience, and qualifications.[27] "To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Id. at 980 (citation omitted). Plaintiff only offers the declaration of her attorney in support.

Defendant argues that $650 an hour is not a reasonable rate. In support of this argument, defendant offers the declaration of Lynda C. Shely, a legal ethics expert. Shely avers that "my opinion is that an hourly rate of $650 is unreasonable and not remotely within the range of average hourly rates charged in Arizona by a small/solo firm lawyer with only 11 years of civil litigation experience and no additional qualifications."[28] Shely avers that her opinion is "further supported by the State Bar of Arizona 2016 Economics of Law Practice in Arizona ... survey of hourly rates charged by Arizona lawyers,"[29] This publication shows that

--------

[27]Strojnik Declaration at 2-3, ¶ 6, which is appended to Motion for Default Judgment, Docket No. 16.

[28]Declaration of Lynda C. Shely at 4-5, ¶ E.2, Exhibit J, Defendant's Response to Plaintiff's Motion for Default Judgment, Docket No. 17.

[29]Id. at ¶ E.3.

the median hourly rate for a lawyer with eleven years of experience, such as plaintiff's

attorney, is $279 and that the median hourly rate for lawyers representing plaintiffs in litigation

matters is $299.[30] This publication further shows that the median rate for lawyers in Maricopa

County is $282.[31] Shely also avers that she is a sole practitioner with 30 years of experience

and her hourly rate is only $360 and that in her experience "[r]ates above $350/hour for

lawyers with 10-14 years of experience are charged only by lawyers at large national firms,

practicing in specialized areas of law."[32]

The court concludes that an hourly rate of $650 for a lawyer with eleven years of

experience is unreasonable, but given counsel's experience with ADA matters, an hourly rate

higher than the median rates discussed above is justified. The court finds that an hourly rate

of $350 is reasonable.

Counsel for plaintiff has devoted a total of twelve hours to this case.[33] Plaintiff argues

that this was reasonable. Shely, however, avers that

> it is impossible to gauge whether twelve hours of claimed lawyer
> time .... is reasonable for generating [p]laintiff's boiler-plate
> complaint and attachments in this case because Strojnik did not
> include a statement breaking down the twelve hours to indicate ...

---

[30]State Bar of Arizona Economics of Law Practice in Arizona 65 (2016 ed).

[31]Id. at 64.

[32]Shely Declaration at 4, ¶ E.3, Exhibit J, Defendant's Response to Plaintiff's Motion for Default Judgment, Docket No. 17.

[33]Strojnik Declaration at 5, ¶ 13, which is appended to Motion for Default Judgment, Docket No. 16.

> whether the time was for legal work or purely non-billable clerical
> tasks (such as copying and filing the complaint).[34]

Shely avers that "Strojnik failed to establish that twelve hours of lawyer (or paralegal) time

would be a reasonable amount of time ... for what work was performed for this specific case."[35]

The twelve hours expended by plaintiff's counsel on this case, although minimal, was

not be reasonable. For one thing, plaintiff's counsel avers that he spent 2.60 hours researching

"mootness in the 9th Circuit" and "the issue of 'nominal damages' in ADA cases in the 9th

Circuit...."[36] These are issues that have come up in other cases filed by Mr. Strojnik on behalf

of Mrs. Brooke and should have required only minimal new research on Mr. Strojnik's part.

It also should not have taken Mr. Strojnik 2.6 hours to research, draft, and file the instant

motion, given that it is almost identical to at least one other such motion he recently filed in

another case brought by Mrs. Brooke. The court concludes that a reasonable amount of time

to have spent on this case was nine hours.

The lodestar amount in this case is $3,150.[37]

After the lodestar is calculated, "the district court then assesses whether it is necessary

to adjust the presumptively reasonable lodestar figure on the basis of the Kerr factors that are

---

[34]Shely Declaration at 4, ¶ E.4, Exhibit J, Defendant's Response to Plaintiff's Motion
for Default Judgment, Docket No. 17.

[35]Id.

[36]Strojnik Declaration at 5, ¶ 13, which is appended to Motion for Default Judgment,
Docket No. 16.

[37]9 x 350 = 3,150.

not already subsumed in the initial lodestar calculation." Morales v. City of San Rafael, 96

F.3d 359, 363–64 (9th Cir. 1996).  The Kerr factors are:

> (1) the time and labor required, (2) the novelty and difficulty of
> the questions involved, (3) the skill requisite to perform the legal
> service properly, (4) the preclusion of other employment by the
> attorney due to acceptance of the case, (5) the customary fee, (6)
> whether the fee is fixed or contingent, (7) time limitations
> imposed by the client or the circumstances, (8) the amount
> involved and the results obtained, (9) the experience, reputation,
> and ability of the attorneys, (10) the "undesirability" of the case,
> (11) the nature and length of the professional relationship with the
> client, and (12) awards in similar cases.

Id. at n.8.

Kerr factors 1, 2, 3, 8 and 9 are subsumed in the lodestar calculation.  Because these

types of ADA cases may be considered undesirable, a small upward adjustment is called for

here.  The court concludes that a reasonable amount of attorney's fees in this case is $3,600.

Finally, plaintiff seeks $460 in costs, which represents the filing fee and service of

process fee.[38]  Plaintiff is entitled to recover these costs.

### Conclusion

Plaintiff's motion for default judgment[39] is granted.

The clerk of court shall enter judgment as follows.  The court declares that, at the time

this lawsuit was filed, defendant was in violation of the Americans with Disabilities Act

because its hotel reservations website did not afford disabled persons equal access to

---

[38]See Exhibit 1, Motion for Default Judgment, Docket No. 16.

[39]Docket No. 16.

-18-

defendant's public accommodation. Defendant is enjoined as follows: defendant is hereby enjoined to ensure that it is, and that it remains, in compliance with 28 C.F.R. § 36.302(e)(1)(i) such that ADA-accessible rooms may be reserved in the same manner as non-ADA-accessible rooms.

Judgment for the following sums is awarded:

(1)    Costs: Four Hundred Sixty Dollars ($460.00); and

(3)    Attorney Fees: Three Thousand Six Hundred Dollars ($3600.00)

for a total judgment of Four Thousand Sixty Dollars ($4060.00).

DATED at Anchorage, Alaska, this 21st day of November, 2017.

/s/ H. Russel Holland
United States District Judge

-19-